## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**THE BROADWAY LEAGUE INC.**,

                 Plaintiff,

   vs.

**BERNARD TELSEY CASTING, INC.,
d/b/a TELSEY & CO.**,

**TARA RUBIN CASTING CO.**,

**CAPARELLIOTIS CASTING, INC.**,

**JIM CARNAHAN CASTING, INC.**,

**CALLERI CASTING, INC.**,

**CINDY TOLAN CASTING, LLC**,

**STEWART/WHITLEY CASTING LLC**,

**CASTING SOCIETY OF AMERICA**,

**INTERNATIONAL BROTHERHOOD OF
TEAMSTERS THEATRICAL DRIVERS
AND HELPERS LOCAL 817**,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No.:

## <u>COMPLAINT</u>

## Table of Contents

I.  NATURE OF THE ACTION ....................................................................... 1

II.  JURISDICTION AND VENUE ................................................................... 4

III.  THE PARTIES............................................................................................ 5

    A.  The Plaintiff. .................................................................................... 5

    B.  The Defendants. ................................................................................ 5

    C.  Unnamed Coconspirators................................................................. 8

IV.  THE CASTING SERVICES MARKET........................................................ 9

    A.  A Show Is Born................................................................................. 9

    B.  Casting Companies Bring Their Databases to Bear........................ 11

    C.  Casting Companies Handle the Logistics of Casting Shows. .......... 13

    D.  The Defendant Casting Companies Dominate the Business Market for
        Broadway Casting Services. ........................................................... 14

V.  THE CONSPIRACY ................................................................................. 15

    A.  The Formation:  Casting Companies Enlist the Teamsters to Orchestrate a
        Cartel of the Casting Services Market. ........................................... 15

    B.  The Plan:  The Casting Cartel Develops a Multi-Faceted Strategy to
        Increase Price, Eliminate Competition, and Preserve Their Dominance............. 16

        1.  The Casting Cartel Embarks on a Public Campaign to Create
            Commercial Risk for Non-Capitulating Producers................................... 19

        2.  The Casting Cartel Demands a 29% Surcharge and Union
            Recognition ............................................................................. 21

    C.  The Boycott:  The Casting Companies Engage in a Concerted Refusal to
        Deal with Any Producer That Does Not Agree to Their Demands. ..................... 22

    D.  The Shield:  The Casting Cartel Concocts Two Ruses to Evade Antitrust
        Liability.......................................................................................... 25

        1.  The Employee Ruse:  Casting Companies Name Themselves
            "Employees" ............................................................................ 25

a.     Casting Companies Are Competing Businesses, Not Employees. .................................................................................. 26

b.     The Casting Cartel's Fictitious "Employee" Label is a Sham. ................................................................................... 34

2.    The Unilateral Conduct Ruse:  Casting Companies Say Common Appointment of the Teamsters as "Agent" Is Just a Coincidence. ........... 37

VI.    ANTICOMPETITIVE EFFECTS AND INJURY ............................................. 39

VII.   COUNT I:  SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 .............................. 40

A.    The Sherman Act Violation ...................................... 40

B.    The Conduct Falls Outside the Limited Antitrust Labor Exemptions ................. 43

VIII.  PETITION FOR RELIEF ................................................. 44

## I.       NATURE OF THE ACTION

1.       Casting companies compete fiercely to be engaged for new Broadway shows. This competition drives down the price for casting services and controls the mounting costs of launching a new Broadway production.   This case concerns a conspiracy by the dominant Broadway casting companies to eliminate this competition in violation of the antitrust laws.

2.       The conspiracy threatens to irreparably destroy competition for decades to come. The effects have already been profound.  In their first salvo since banding together "in solidarity" – to use their words – the casting companies have demanded that Broadway producers pay a surcharge of 29% on all currently negotiated fees, adding tens of thousands of dollars to the cost of putting on a show.  The Broadway League Inc., a trade association of Broadway producers, general managers, and theatre owners seeking to make Broadway shows available to audiences at affordable prices, brings this suit to stop the casting companies' conspiracy in its tracks.

3.       A Broadway show requires a cast.  Finding the right person for the right job from among the ever-changing list of 60,000 actors seeking to work on Broadway is no easy task.  For decades, producers have turned to a select group of established, full-service casting companies, with their sophisticated databases and experienced staff, to identify candidates, run auditions, and handle the logistics of getting a cast in place.  Producers have few choices for these services – the market for casting services is highly concentrated, with the top five casting companies controlling over 70% of Broadway shows.  But the competition for casting services has been robust, forcing prices down and sometimes encouraging casting companies to bear some of the risk of early-stage development.

4.       This competition rankled casting company owners, who wanted to put an end to it.  But they could not do so independently.  "We don't want … to be the one individual who has to stand up and say, 'OK, I'll do it, but you need to pay me upfront.  That's really hard,"

1

explained Bernard Telsey, ringleader of the casting conspiracy and founder of the largest Broadway casting company, which alone controls 30% of the market.[1]

5.      So, a little over a year ago, the casting companies banded together to form a casting cartel, enlisting the help of the Teamsters to force Broadway producers to engage in collective negotiations.  The casting companies knew that the Teamsters could not provide lawful cover for independent businesses conspiring to fix the fees they charge.  Unions might be able to shield employees seeking to bargain over the terms of their employment, but a union cannot protect price fixing by independent businesses.  Just as law firms cannot fix prices for legal services and accounting firms cannot fix prices for accounting services, casting companies cannot fix prices for casting services.  Casting companies – with their many assets, employees, and client lists – are businesses that compete for client engagements as vendors and independent contractors.  Even the President of the Teamsters Local 817, Tom O'Donnell, recognized that, at least under the current market structure, coordinated conduct by the casting companies violates the antitrust because casting companies have "elements of being independent contractors."[2]

6.      The casting cartel was undeterred.  If they called themselves "employees" (presumably, hiding their companies – and the staff that does the work – behind an invisibility cloak), their legal problems would be solved, or so they thought.  With that scheme in mind, they approached the Broadway League, which serves as collective bargaining agent on behalf of its members when dealing with *actual* employees and their unions, and asked to be recognized.

7.      The League declined, explaining that fictitious labels do not change commercial realities.  Casting companies, the League explained, fall outside the scope of legitimate union

---

[1] *See* www.hollywoodreporter.com/news/broadway-casting-directors-fight-unionize-article.1.3182204.

[2] *See* www.hollywoodreporter.com/news/broadway-casting-directors-rally-union-contract-radio-city-music-hall-1011447.

activity because those companies are not, and never have been, employees.  They are businesses that bring to bear their own intellectual property, assets, and staff to the services they provide, and they compete in the marketplace as independent contractors.  If the casting companies' employees wanted to bargain with their employers – the casting companies themselves – that would be fine.  But the casting companies could not pretend to be "employees" just to avoid competing with each other.

8.     The League invited the Teamsters to litigate the legality of this "label change" scheme before the National Labor Relations Board, the agency authorized to mandate union recognition where statutory requirements are met.  The casting cartel declined because, as Cindy Tolan, co-founder of Defendant Tolan Casting, explained, we "obviously know what the outcome will be."[3]

9.     Rather than seeking a legal determination of rights, the casting companies instead resorted to commercial leverage:  a boycott of any producer that does not agree to the casting cartel's demands, including Teamster recognition, the right to collectively bargain, and a 29% surcharge on all negotiated fees.  As Tom O'Donnell, President of Teamster Local 817, explained,

> "Casting directors are not going to leave it up to the Trump administration to decide if they have rights…."

> "We're not looking to disrupt business.…  But at the end of the day, we're going to look at every option."[4]

10.     The boycott was immediate, effective, and unyielding.  As cartel ringleader Mr. Telsey explained, "all casting directors are in agreement to not accept new work unless" their

---

[3] *See* www.npr.org/2017/09/04/548505846/casting-directors-on-broadway-seek-to-unionize.

[4] *See* deadline.com/2017/08/casting-directors-rally-in-shubert-alley-120215274; deadline.com/2017/05/broadway-producers-versus-casting-directors-1202102410.

demands are met.  In the weeks since the boycott began, many shows have been put in jeopardy as a result of the casting cartel's illegal concerted refusal to deal.

11.     The anticompetitive effects this conduct has had – and will continue to have for decades to come, if not stopped now – are profound.  Broadway producers rely on price competition among casting companies to control costs, especially for productions in development.  Most shows fail to see a Broadway stage, and many that do close their doors not long after.  Almost 80% never see a dime of profit.  Controlling costs can make the difference between shows that audiences have a chance to see – with a shot at becoming a hit – and shows that are nothing more than a producer's abandoned dream.  By eliminating price competition among casting companies – and adding potentially tens of thousands of dollars to the developmental costs of a show – the casting cartel disserves the Broadway community and ultimately reduces the broad range and diversity of shows that ever see the light of day.  Actors and audiences will be the ultimate losers if this cartel is allowed to go on.

## II.     JURISDICTION AND VENUE

12.     The Broadway League brings this action pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive relief, costs of suit, and reasonable attorneys' fees for violations of section 1 of the Sherman Act, 15 U.S.C. § 1.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).  This Court has personal jurisdiction over each defendant because each defendant resides, transacts business, or can be found in this District, and has engaged in illegal acts within this District.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 22, as each defendant resides, transacts business, or can be found in this District and a substantial portion of the events described in this complaint have been carried out in this District.

### III.    THE PARTIES

####   A.    *The Plaintiff.*

13.    __The Broadway League Inc__.  The Broadway League Inc. is the national trade association for the Broadway industry, incorporated under the laws of New York and with its principal place of business at 729 Seventh Avenue, New York, NY 10019.  Its 700-plus members include theatre owners and operators, producers, presenters, and general managers, who bring Broadway productions to the stage in New York for the millions of local patrons and New York City tourists, and to more than 200 cities across the United States and Canada.  The League supports its members through an array of programs, services, and events designed to promote Broadway as an accessible and vibrant national entertainment medium.  The League is the recognized collective bargaining agent for its members, and negotiates union contracts with the unions that represent actual employees.  As part of the events described herein, the defendants affirmatively sought to enter into collective negotiations with the Broadway League as the representative of its members.

####   B.    *The Defendants.*

14.    __Telsey & Co__.  Described by the New York Times as "a high powered firm," Defendant Bernard Telsey Casting, Inc., d/b/a Telsey & Co., is a New York corporation, with its principal place of business at 1501 Broadway, New York, NY 10036.  Telsey & Co. was founded in 1988 by Bernard Telsey, who serves as its President and CEO.  Telsey & Co. describes itself as an "award winning organization of casting professionals in New York City and Los Angeles, with local, regional, national, and international clientele."  It has over 30 employees located in offices in New York and Los Angeles, and provides casting services for theatre, film, and television.  It is the largest Broadway casting company, controlling

approximately 30% of recent Broadway productions.  Telsey & Co. is a non-labor group under the antitrust laws.

15.    **Tara Rubin Casting**.  Tara Rubin Casting Company ("Tara Rubin Casting") is an organization with its principal place of business at 200 West 41st Street, New York, NY 10036.  Tara Rubin Casting was founded in 2001 by Tara Rubin.  Today, Tara Rubin Casting employs at least nine casting professionals as well as other staff.  Tara Rubin Casting has been described as a "top" casting company, and provides casting for theatre, film, and television.  It is the second largest Broadway casting company, controlling approximately 16% of recent Broadway productions.  Tara Rubin Casting is a non-labor group under the antitrust laws.

16.    **Caparelliotis Casting**.  Caparelliotis Casting Inc. (formerly MelCap Casting Inc.), is a New York corporation with its principal place of business at 260 West 44th Street, New York, NY 10036.  Caparelliotis Casting is owned by David Caparelliotis and provides casting for theatre, film, and television.  Caparelliotis Casting has at least three employees, including two casting directors and a casting assistant.  Caparelliotis Casting provides casting services for about 11% of recent Broadway productions.  Caparelliotis is a non-labor group under the antitrust laws.

17.    **Carnahan Casting**.  Jim Carnahan Casting, Inc. ("Carnahan Casting") is a New York corporation, with its principal place of business at 200 Park Avenue, New York, NY 10003.  Its principal casting director is Jim Carnahan.  In addition to offering casting services to commercial Broadway productions through Carnahan Casting, Jim Carnahan is the resident casting director for the non-profit theatre group, Roundabout Theatre.  (The conspiracy alleged herein specifically excludes non-profit productions).  Carnahan Casting has provided casting

services for about 9% of recent Broadway productions.   Carnahan Casting is a non-labor group under the antitrust laws.

18.   **Calleri Casting**.   Calleri Casting Inc. ("Calleri Casting") is a New York corporation, with its principal place of business at 39 West 14th Street, New York, NY 10011. Calleri Casting employs three casting directors, including founder James Calleri, as well as other assistants and staff.   Calleri Casting provides casting services for about 5% of recent Broadway productions.   Calleri Casting is a non-labor group under the antitrust laws.

19.   **Tolan Casting**.   Cindy Tolan Casting LLC ("Tolan Casting") is a New York limited liability company, with its principal place of business at 27 West 20th Street, New York, NY 10011.   Tolan Casting provides casting services for theatre, film, and television.   It is owned by founder Cindy Tolan, who serves as its principal casting director, and employs two casting associates and a casting assistant.   Tolan Casting provides casting services for approximately 2% of recent Broadway productions.   Tolan Casting is a non-labor group under the antitrust laws.

20.   **Stewart/Whitley Casting**.   Stewart/Whitley, LLC ("Stewart/Whitley Casting") is a New York Limited Liability Company with its principal place of business at 213 West 35th Street, New York, NY 10001.   Stewart/Whitley Casting is co-owned by Duncan Stewart and Benton Whitley, and provides casting services for theatre and television.   Including its two co-owners, it employs six casting directors, associates, or assistants, as well as interns. Stewart/Whitley Casting casts approximately 2% of recent Broadway productions. Stewart/Whitley is a non-labor group under the antitrust laws.

21.   **Casting Society of America**.   The Casting Society of America is a trade association for casting professionals, with headquarters at 1149 N. Gower St., Los Angeles, CA 90038.   According to its website, the CSA "currently boasts more than 700 members" who are

involved in casting film, TV, and theatre. Among its members are Bernard Telsey, who serves as Vice President of the CSA and president of the CSA's New York Chapter; David Caparelliotis, who serves on the Board of Directors of CSA's New York Chapter; Tara Rubin, who also serves on the Board of Directors of CSA's New York Chapter; and James Calleri, who serves as Treasurer of CSA's New York Chapter. The CSA admits on its website that, although the "CSA is not a union," it "cooperat[es]" with the Teamsters for the mutual benefit of their casting company members. The casting company defendants, and other coconspirators, have conspired with the CSA to reach and implement the unlawful agreements described herein. The CSA is a non-labor group under the antitrust laws.

22. **Local 817 of the International Brotherhood of Teamsters**. The International Brotherhood of Teamsters Theatrical Drivers and Helpers Local 817 (the "Teamsters" or "Local 817") is a labor organization, as defined in 29 U.S.C. § 402(i). The Teamsters purport to represent workers in the motion picture and television industries in New York, including employees who drive production equipment. As of June 2016, it also purported to represent between 50 and 60 full-time or part-time casting professionals, who are currently employees or owners of casting companies but not employees of producers. The casting company defendants, and other conspirators, have conspired with the Teamsters to reach and implement the unlawful agreements described herein.

C. *Unnamed Coconspirators.*

23. Defendants have conspired with additional, unnamed persons and entities, including other casting companies, casting directors, casting associates, and other employees of casting companies. The co-conspirators include principal casting directors Bernard Telsey, Tara Rubin, David Caparelliotis, James Calleri, Jim Carnahan, Duncan Stewart, Benton Whitley, and Cindy Tolan. The co-conspirators also included Binder Casting Inc., which, on information and

8

belief, had previously been a participant in the casting cartel, but subsequently announced, through its Chief Legal Officer, its withdrawal or non-participation in such conspiracy after the Broadway League raised antitrust concerns.

24.     For avoidance of doubt, as used in this Complaint, "casting companies" refers to the defendant casting companies, including their owners, officers, employees, and agents; and "casting cartel" refers to the defendant casting companies, the Teamsters, the CSA, and their coconspirators.

## IV.     THE CASTING SERVICES MARKET

### A.     *A Show Is Born.*

25.     In theatre parlance, the term "Broadway" refers to theatrical performances presented in the 41 professional theatres with 500 or more seats located in the Theater District and Lincoln Center along Broadway, in Midtown Manhattan.  It is widely considered the pinnacle of commercial theatre in the world.  Over 13 million people attend Broadway shows each year, with many successful shows subsequently launched as national and international tours presenting performances around the country and the world to reach an even broader audience.

26.     Putting on a Broadway show is no easy task.  Rights to each show must be negotiated, theatre space secured, auditions and rehearsals scheduled, marketing and promotional materials prepared, and cadres of employees, independent contractors, and vendors assembled into a well-orchestrated and harmonious operation.  On any given Broadway production, there may be as many as 500 or more people associated with the show, including actors, musicians, directors, designers, stagehands, wardrobe personnel, hairstylists, make-up artists, and ushers.

27.     A Broadway production usually begins with a producer, who oversees all aspects of mounting a show and is responsible for the production's financial and managerial functions. Producers are responsible for securing the rights to the work, and thereafter, assembling the

creative team – including the director, designers, composer, and choreographer – and establishing a management team, including the general manager. At some point during the early development of a Broadway production, most producers establish a production company as a separate legal entity to conduct the show's business, employ staff, contract with vendors, and manage finances and risk.

28. But before there is a production company, and long before there is a cast, there is an idea and a script. To test the viability of the venture, the producer usually engages in significant development work. First as an informal "Table Read," engaging a small group of actors to read through the script. Then, if a show is worth pursuing, the producer will hold what is known as a "29 Hour Reading." During a 29 Hour Reading, actors – who may or may not be ultimately cast for the production run of the show – work with the creative team over the course of a week to perform roles and to allow the creative team to further hone the script. A 29 Hour Reading for a musical, for example, will include singing and music, but no costumes, staging, or dancing.

29. As a show progresses through the development process, the producer may choose to hold additional dry-runs in "Staged Readings" – sometimes in full dress – at "Developmental Labs" or "Workshops," which may occur over the course of many weeks. All of this occurs prior to rehearsals or pre-Broadway production try-out runs.

30. Each stage of the development process requires actors. Producers, working with the rest of the creative team, are responsible for selecting the right person for the part. They cannot do so on their own. For that, they engage the services of independent vendors called casting companies.

10

**B.** ***Casting Companies Bring Their Databases to Bear.***

31.     There are over 60,000 actors in New York, representing an extraordinary diversity of skills and talents.  For some roles – like a show built to showcase a particular superstar – casting the leading role is often done entirely by the director or the producer.  But for most roles, identifying the right actor from the 60,000-plus potential options is an impossible task for any one individual.  That is why producers hire casting companies.

32.     A casting company is essentially a logistics company with a database.  It identifies candidates and runs auditions.  Casting companies, however, do not make the hiring decisions for the show and are not responsible for negotiating the terms of engagement with actors.  As Jay Binder, founder of Binder Casting, explained, "[i]t is not our job to make the final decision, but what is our job is to focus [on] the ***process*** for the director and the producer, so that they have in front of them a focused pool from which to choose from."[5]  As another casting director explained more colorfully, "[a] casting director is nothing more than glorified human resources.…  We don't hire.  We're traffic managers, bringing in and out of the audition room a flow of talent."[6]

33.     To identify an initial pool of candidates, casting companies review the script and hold extended discussions with the creative team to understand the needs for each part.  They then query their database to identify a list of potential candidates.  It is not uncommon, for example, for a casting company to generate a list of 20 to 30, or even up to 100 candidates for a single role.

---

[5] *See* www.playbill.com/article/ask-playbillcom-casting-com-143060.

[6] *See* answersforactors.net/2009/08/13/a-casting-directors-rude-behaviour.

34.     To generate this list, casting companies rely on their databases.   A casting company's database, including its computer files and written records, is a valuable piece of intellectual property and a core asset of the firm.   Such databases are carefully and painstakingly maintained for use by the casting company's entire staff in all of the casting company's engagements.   A database is built over years of invested time and resources.   It is not the product of an individual employee working on a discrete engagement for a specific Broadway producer.

35.     Generating and maintaining a useful and reliable database requires substantial and continuous effort by the casting companies' employees.   Promising new actors trying to break into the industry are always arriving on the scene.   Industry veterans are constantly expanding their resume, skills, and desires.   Still others retire or move on to other projects, such as film or television.   While some basic information such as name, location, age, and ethnicity may be publicly available, a casting company's database must be much richer.   Casting companies need to inform the producer about each candidate's talents, strengths, and weaknesses, tailored for the specific part.   They also need to provide head shots, bios, videos, availability, and other useful, up-to-date information.   To do this, casting companies need to continuously search out new prospects, interact with actors' agents, keep impeccable records, and get to know each of the actors in their constantly-evolving database.

36.     All of the capital investment and most of the effort needed to develop a casting company database is not related to a specific show.   As Ms. Rubin, founder of Tara Rubin Casting, explained,

> "Our team covers all of the Broadway and Off-Broadway shows [and] provide[s] a good summary [of each] in writing.   We also attend the college showcases and many of our staff members work with students at the major theater programs around the country so we often have a bit of background before the new actors arrive in New York.   Working in regional theaters helps us become acquainted with actors who don't live in NYC, and we audition frequently in L.A., Chicago,

and Toronto.  We also pay special attention to the television series that are cast in New York."[7]

Casting companies will also attend workshops and auditions to build their databases, hoping to find talent for future shows, including ones that have not yet been conceived.  More recently, casting companies have dedicated their firms' resources to scouring the internet and social media.  One of the largest casting companies, Telsey & Co., for example, hires employees specifically to monitor YouTube videos, hoping to find the next star.

### C.   *Casting Companies Handle the Logistics of Casting Shows.*

37.     Generating a list of potential candidates is just the first step in casting a show.  Once a casting company provides the list, the creative team gets to work, evaluating the information provided on each candidate and considering any additional pieces of information the casting company provides that may not be reflected in its written work product (*e.g.*, this actor is hard to work with, that one is delightful).  After the creative team narrows the list, the casting company will work with the actors' agents to determine availability and interest, and will then schedule the reading, workshop, or audition.

38.     Casting companies are responsible for organizing and running the auditions required by the Actors' Equity Association, a union of actors and stage managers.  This involves not just on-the-scene work, but advance preparation that can only be handled by a team of well-qualified staff.  Ms. Rubin explains:

> "If I am going to auditions, all the materials [need to be] prepared in advance by our great assistants …, so I can grab and go.  I think people would be very surprised to know how much work goes into properly organizing a casting session and the detail involved – making sure the lists are properly typed, and the actors have been sent the right material."[8]

---

[7] *See* www.backstage.com/interview/cd-tara-rubin-what-makes-successful-audition.

[8] *See* www.backstage.com/interview/cd-tara-rubin-what-makes-successful-audition.

A casting company is not a one-person show when it comes to making recommendations to the creative team.  Again, Ms. Rubin explains, "[a]fter a session, we're invariably jazzed up, so there's a lot of trading stories and ideas when we get back to the office."[9]

39.     Once a cast is selected, the casting company continues with the show on retainer. There will always be situations where cast members leave a show, creating the need for replacements.  Regardless of the amount of time or work involved, it is the casting company's responsibility to generate lists of potential candidates and hold any necessary casting sessions or auditions throughout the life of the show.

**D.     *The Defendant Casting Companies Dominate the Business Market for Broadway Casting Services.***

40.     Producers have few choices when it comes to selecting casting companies.  There are only a handful of firms equipped to handle the demands of a major Broadway production.  As the chart below illustrates, the defendant casting companies control over three-quarters of commercial Broadway productions.



---

[9] *See id.*

41.     The high concentration arises from the fact that there are significant barriers to entry in this market.  Like most "matchmaking" services, casting companies operate in two-sided markets, matching producers looking to fill acting roles with actors looking for jobs.  As a casting company builds its database, it becomes more attractive to producers and able to gain a larger share of new engagements.  This in turn makes the casting company more attractive to actors (and their agents), allowing the casting company to further improve its database.  This creates powerful network effects that serve as daunting barriers to entry.  Large casting companies also benefit from significant economies of scale by acquiring knowledge about actors that may cross many potential engagements.  Entry is also difficult because it depends on establishing strong and durable relationships with producers, directors, actors, and actors' agents.

## V.      THE CONSPIRACY

### A.      *The Formation:  Casting Companies Enlist the Teamsters to Orchestrate a Cartel of the Casting Services Market.*

42.     Although the market for casting services is concentrated, casting companies compete aggressively for new engagements.  They compete on price, the quality of their databases, and the skills of their employees.  Price competition poses a particularly serious problem for them.

43.     Putting on a Broadway show is financially risky, and most shows fail to recover their investment.  Controlling development costs is, therefore, critical.  Because casting services are one of the few significant cost items that are not subject to anticompetitive union rules, price plays an important role in a producer's selection of casting companies.

44.     This price competition allows new casting companies to break into the market, and smaller ones to expand, despite the significant barriers to entry.  Indeed, a number of casting companies have been able to break into the market in recent years.  By offering lower prices,

these firms have increased market share, hurting the larger firms' bottom lines and threatening their dominance.

45.     To eliminate this threat, the largest casting companies joined forces with Local 817 of the Teamsters in an effort to cartelize the casting services market and eliminate price competition.  Speaking candidly to the *New York Daily News*, ringleader Bernard Telsey of Telsey & Co. explained that he needed a union to increase the fees producers paid for casting services during early-stage development.  "We don't want … to be the one individual who has to stand up and say, 'OK, I'll do it, but you need to pay me upfront' … [t]hat's really hard."  It would be easier to make such demands, he explained, if there was no competition, and that is "where a union would really help."[10]

46.     The discussions about how to cartelize the casting services market began at least as early as June 2016, the precise dates being unknown.  Since then, the casting companies and the Teamsters have been in "constant communication," as the casting companies' trade association – defendant Casting Society of America – admits.  Many of these discussions were held under the auspices of the CSA, and through frequent phone calls, emails, text messages, and in-person meetings, as the casting companies and the Teamsters developed and implemented their plan.

### B.     *The Plan:  The Casting Cartel Develops a Multi-Faceted Strategy to Increase Price, Eliminate Competition, and Preserve their Dominance.*

47.     From the outset, the casting companies and the Teamsters recognized that the antitrust laws pose a serious obstacle to their ability to act in concert.  As independent businesses and contractors, the casting companies recognized that the National Labor Relations Board

---

[10] *See* www.nydailynews.com/new-york/manhattan/broadway-casting-directors-fight-unionize-article-1.3182204.

would not, and could not, require producers to recognize the Teamsters as the legally-authorized bargaining agent for the casting companies. As Cindy Tolan, owner of Tolan Casting, explained during an NPR interview, the casting companies knew they would fail if they pursued legal channels:

> NPR Voiceover: "The Broadway League says it's encouraged the Teamsters to take their arguments to the National Labor Relations Board, or NLRB, and will abide by its ruling. But Cindy Tolan points out the board's members are appointed by the president."
>
> TOLAN: "Currently the President of the United States, of our country, is Donald Trump. Yes, of course they want to put it in front of the NLRB board - *obviously know what the outcome will be.*"[11]

Teamsters Local 817 President, Tom O'Donnell, echoed this statement, explaining that the "[c]asting directors are not going to leave it up to the Trump administration to decide if they have rights."[12] Of course, the P.R. statements made by Ms. Tolan and Mr. O'Donnell failed to mention that the League first offered to litigate the issue before the NLRB in mid-2016, during the Obama administration, and the casting cartel refused to participate then too.

48. Facing dim prospects of a favorable legal ruling under any administration – and recognizing that an adverse ruling would doom their entire effort – the casting cartel chose instead to take matters into their own hands, seeking to achieve through commercial leverage what they could not obtain legally.

49. Their strategy took a page from the Teamsters' old playbook. In 2005, film and television casting directors joined the Teamsters. As here, the producers initially resisted because the casting directors were independent contractors, not employees. And like here, the Teamsters took matters into their own hands, threatening strikes rather than submitting the issue

---

[11] *See* www.npr.org/2017/09/04/548505846/casting-directors-on-broadway-seek-to-unionize.

[12] *See* deadline.com/2017/08/casting-directors-rally-in-shubert-alley-1202152743.

to the National Labor Relations Board.  The commercial pressure was too great for the Hollywood producers, and they quickly capitulated.

50.     A decade later, the Teamsters and the Broadway casting companies have agreed to take the same approach against the Broadway producers.  As Teamsters Local 817 President Tom O'Donnell, explained, "I was able to prevail upon the Hollywood studios" to accept the Teamsters' demands, and "we're hoping to prevail upon the Broadway producers" to do the same thing.  Mr. O'Donnell went further, however, threatening producers with a boycott if they did not capitulate as their Hollywood brethren had.  "We're trying to do it as friendly and as nice as possible," Mr. O'Donnell explained, but "[w]e'll do whatever it takes."[13]  To ensure there was no ambiguity, Ms. Tolan explained that, when Hollywood producers made "the same argument that [casting directors] were independent contractors," "the threat of a strike helped to change their minds."[14]  The threat was hardly veiled.  While Mr. Telsey professed that a strike was "not ultimately what anybody wants," he continued, "I have to keep saying that's not going to happen – but we all know that what happens, happens."[15]

51.     Committed to flexing their commercial leverage, the defendants embarked on a three-step plan.  *First*, they would engage in a media and public relations campaign to garner public support and increase the commercial risk producers would face if they resisted.  *Second*, casting companies would divide and conquer by boycotting any individual producer that did not agree to their demands.  And *third*, once the Teamsters got their foot in the door and were recognized as the common negotiation agent for the casting companies, they would impose

---

[13] *See* www.hollywoodreporter.com/news/broadway-casting-directors-rally-union-contract-radio-city-music-hall-1011447.

[14] *See* www.npr.org/2017/09/04/548505846/casting-directors-on-broadway-seek-to-unionize.

[15] *See* deadline.com/2017/08/casting-directors-rally-in-shubert-alley-1202152743.

increasingly severe and onerous conditions designed to prevent future price competition in the casting services market.  Steps one and two are well under way; the third will depend on the outcome of this lawsuit.

> 1.   The Casting Cartel Embarks on a Public Campaign to Create Commercial Risk for Non-Capitulating Producers.

52.    After almost a year of planning, the defendants were ready to take overt steps in furtherance of their cartel.  It began with an extensive and ongoing media and public relations campaign, which has involved a number of staged events, numerous articles, interviews, and social media posts.

53.    The campaign had two purposes.  *First*, the casting cartel needed a cover story. Rather than admitting that the casting companies were seeking to enhance their own profits through the elimination of competition, they needed to reframe the issue as a *feigned* concern over health and retirement benefits.  The casting companies had never asked for or sought compensation for health and retirement benefits from their clients until they joined forces with the Teamsters and realized they needed an excuse to cartelize the casting services market.  Nor are the casting companies' employees seeking to unionize to get their *actual* employers – *the casting companies themselves* – to provide such benefits.  In fact, while some casting companies do not provide their employees with health and retirements benefits – choosing profits for their principal-casting-director-owners over the care of their more junior employees – other casting companies do provide such benefits.  Regardless, the casting companies' effort to impose a surcharge on their fees is for their *own* corporate benefit, either to increase their bottom lines or to shift responsibility for the care of their employees to their clients, the producers.

54.    *Second*, the casting cartel engaged in a media and public relations campaign to present a united demonstration of force, all in an effort to show that their threatened boycott

would cause serious commercial risk to recalcitrant producers.  To instill fear that a producer's rejection of their demands would jeopardize the entire production, the casting cartel sought to enlist the help of other unions – most importantly, Actors' Equity.  As Tara Rubin, founder of one of the top casting companies, explained during an interview, getting Actors' Equity on their side was far more important to the casting companies than their actual *legal right* to engage in the cartel.

> Reporter: "Didn't the League offer to negotiate with you through the National Labor Relations Board?"
>
> Rubin: "We received a letter of support from COBUG — the Coalition of Broadway Unions and Guilds. They stand behind us 100%. It is our hope that the Broadway League and our union can speak reasonably to each other without a job action…."
>
> Reporter: "I am sure that the actors, **whose jobs depend on your efforts**, would support you."
>
> Rubin: "Actors' Equity, a member of COBUG, is behind us."[16]

This interchange reveals the casting cartel's true motivations.  Ms. Rubin deflected the question about the casting companies' legal rights, asserting instead that the question is moot because obtaining the backing of other unions would give them commercial leverage to threaten the producers with a devastating "job action" if the producers do not bargain collectively.

55.     In one of the most public shows of force, the casting cartel staged events in connection with the 2017 Tony Awards, the premiere annual awards ceremony dedicated to Broadway.  At a rally outside of Radio City Music Hall during a Tony Awards rehearsal on June 8, 2017, principal casting director-owners, Bernard Telsey, Tara Rubin, David Caparelliotis, and Cindy Tolan joined together with members of various Broadway unions to deliver the message that failure to accept their demands would have serious consequences for producers.  Ms. Rubin

---

[16] *See* www.clydefitchreport.com/2017/06/casting-directors-union-broadway.

returned to her theme – that legal rights do not matter because the casting companies have the "support from the other Broadway unions – IATSE, Actor's Equity" – to force "the producers [to] do the right thing."[17]

2.    The Casting Cartel Demands a 29% Surcharge and Union Recognition

56.    After six months of plastering the airwaves, the casting cartel moved to phase two – forcing producers to agree to an initial list of demands. Those demands were set forth in a document titled "THEATRICAL TEAMSTERS LOCAL 817 – BROADWAY CASTING DIRECTOR AGREEMENT," and informally called the Teamsters' "Deal Memo." In early October 2017, the casting companies first sent the Deal Memo to a producer with a show starting development. The Deal Memo purports to be an "Agreement of Employment" and requires union acceptance.

57.    Though silent on many critical terms typically contained in a casting company services agreement, the Deal Memo and its successive iterations seek to impose a 29% **surcharge** on the negotiated fees for all casting services. Because casting services fees often exceed $100,000 per production, this surcharge can add tens of thousands of dollars to the costs of producing a Broadway show.

58.    The Deal Memo characterizes the surcharge as a contribution for "Pension and Welfare benefits." Specifically, it states that the "Producer shall, on the 10th day of each month, pay to Local 817 I.B.T. Welfare Fund a sum equal to 17.5% of the gross compensation paid to each Casting Director …, and shall … pay to the Local 817 I.B.T. Pension Fund a sum equal to 11.5% … during the preceding month."

---

[17] *See* www.hollywoodreporter.com/news/broadway-casting-directors-rally-union-contract-radio-city-music-hall-1011447.

59.     In fact, the surcharge is not designed to cover the health and retirement costs of the casting companies' employees who work on the production.  By design, the surcharge inures solely to the benefit of the casting company *owner* and the Teamsters.

60.     The surcharge would enhance profit for casting company owners (the anticipated signatory to the contract), regardless of its designation as health or retirement benefits.  The surcharge applies to the total negotiated fee for casting services.  Casting companies use these fees to cover overhead, compensation for their own employees, other costs, and capital disbursements to its owner.  Because the surcharge applies to the total fees for the project, it is unrelated to the personal compensation received as income for any individual working with the production.  Moreover, because the contribution would be made solely in the casting-director-owner's name, it constitutes pure profit for him or her, rather than a contribution toward the health and retirement expenses of the casting company's junior employees who work on the firm's client engagements.

61.     The surcharge also benefits the Teamsters, who demanded payments to their benefits funds as *quid pro quo* for the Teamsters' participation in the conspiracy.  By characterizing the payments as "Welfare and Pension Benefits" – rather than their true nature as surcharges on the total costs of services provided by the casting company – the Teamsters believed, rightly or wrongly, that the funds could legally be deposited in their Welfare and Pension Funds, and could be used to help shore up those funds' finances.

**C.      *The Boycott:  The Casting Companies Engage in a Concerted Refusal to Deal with Any Producer That Does Not Agree to their Demands.***

62.     Having created an initial list of demands, the casting cartel proceeded to the next phase in their plan:  a boycott of any producer that did not agree to those demands.  As ring-leader Bernard Telsey explained in a phone call with a producer's general manager shortly after

the boycott began, "*all casting directors are in agreement* to not accept any new work unless" producers sign the Deal Memo.

63.     To implement this boycott, the casting companies enlisted the help of defendant Casting Society of America.  The CSA is not a union.  It is a trade association of casting companies and their employees.  The casting companies control the CSA through leadership positions, and so were able to obtain "the full backing of [the] CSA," as Tara Rubin explained.

64.     On October 6, 2017, CSA sent the following email, referencing the casting cartel's agreement and directing all "Fellow Casting Directors and Associates" to not make any independent decisions relating to new projects:

> "*Fellow Casting Directors and Associates:*
>
> As you know we have been in *constant communication*.   As of today, if you are approached for **ANY** new commercial theatre project intended for Broadway (including readings, workshops, labs) you must immediately contact:
>
>> Terry Casaletta
>> Teamsters Local 817
>> …
>
> *This is to be done BEFORE engaging in or accepting any project* intended for Broadway (with the obvious exception of not-for-profit theatres).   *This is imperative*….
>
> **IN SOLIDARITY**,
>
> The Broadway Community"

65.     The CSA-issued directive kicked off the boycott and was instrumental in ensuring its effectiveness.  By requiring casting professions to channel all new projects to the Teamsters, the casting cartel could prevent the conspiracy from breaking down, ensuring that no producer would have access to any casting company services without the cartel's approval.

66.     The casting companies have uniformly followed this directive since it was issued. Mr. Telsey has insisted on Teamster involvement on at least five projects since the boycott

began.  In speaking to a producer about one of them, he explained that the boycott covered all new productions, even if that new project was already in the works.  "The Oct. 5 or 11 [date] is unfortunately semantics," he said, "as our situation is about *all new jobs*….  When [the discussions on this specific project began], *I was not aware that two weeks later we would be making a decision to not work on any new project* until [the Broadway League] recognize that we want to be treated fairly….  [This is a] situation that *all casting directors* are facing…."

67.    Another casting company – Tolan Casting – also informed a general manager that, its "*hands were tied*" due to participation in the casting cartel, and it could no longer negotiate a casting agreement that does not involve the Teamsters.

68.    Since the boycott began a few weeks ago, many of the leading casting companies have made demands pursuant to their conspiracy.  These include Bernard Telsey and Will Cantler of Defendant Telsey & Co.; David Caparelliotis of Caparelliotis Casting; James Calleri of Calleri Casting; and Cindy Tolan of Cindy Tolan Casting.  The only reason some casting companies have not yet made such demands is because they are not currently in discussions with producers about new engagements that have progressed to the stage of contractual negotiations.

69.    The boycott has exerted, and will continue to exert, substantial commercial pressure on producers.  Because the casting cartel members dominate the market for casting services, producers have few choices beyond the services of the defendant casting companies.  Moreover, because many shows operate on tight time frames – in part because the rights to the work may expire if certain deadlines are not met – the casting cartel's concerted refusal to deal puts extreme pressure on producers to agree to the casting cartel's demands, and threatens producers with substantial injury if they decline to do so.

**D.    *The Shield:  The Casting Cartel Concocts Two Ruses to Evade Antitrust Liability.***

70.    The casting cartel recognized that its conduct constitutes a *per se* violation of the antitrust laws unless the statutory or non-statutory labor exemption applies.  It also recognized that existing commercial practices render it ineligible for those exemptions.  Its solution was to concoct two separate ruses, hoping that at least one would help it evade antitrust liability.  *First*, casting companies would insist on being called "employees," even though the casting companies would continue to perform exactly the same services in exactly the same manner as they had in the past. *Second*, casting companies would deny engaging in collective conduct, claiming instead that it was a coincidence that each company just happened to appoint the Teamsters as its agent.

1.    The Employee Ruse:  Casting Companies Name Themselves "Employees"

71.    Casting companies are businesses acting as vendors and independent contractors. They are employers, not employees.  Because they have "elements of being independent contractors," as Tom O'Donnell, President of Teamsters Local 817, admits, the casting companies decided to change their legal status, or at least the label they go by.  As Mr. Telsey explained to one producer shortly after the boycott began:

> "We have worked well together in the past and while I acknowledge our past collaborations, *the terms of those collaborations are no longer satisfactory to me.  Instead, I prefer at this point to work directly for the producer as an employee*," and "[a]s you know, I have chosen to have Teamsters Local 817 assist [his usual agent] in negotiating the terms of that employment."

72.    But a rose by any other name, smells the same.  The casting cartel's attempted label change is inconsistent with commercial reality.  Casting companies are full-fledged businesses that bring to bear a wide range of resources on each and every engagement, including the talents of their many employees and their extensive intellectual property.  The fictitious label change does not reflect how the casting companies actually interact with producers.

25

a.  *Casting Companies Are Competing Businesses, Not Employees.*

(1)  <u>Casting Companies Are Independently Owned-and-Operated Medium-Sized Businesses.</u>

73.    Casting companies are multi-faceted operations engaged in the business of providing casting services.  Casting companies are not merely financial arrangements formed for the purpose of exploiting tax advantages.  They have a management structure and multiple employees.  They own assets and intellectual property.  They lease office space, pay taxes as businesses or corporations, invest capital, and manage their own finances, budgets, and internal affairs.  They charge set prices for defined services independent of time worked or effort involved, and they routinely compete for client engagements as independent contractors.

74.    They have all the indicia of medium-sized, for-profit businesses competing in a services market.  Like any business, casting companies are responsible for managing their own budgets and finances, reaping the benefits of successful management and bearing the burden of failure.  They realize profits or losses based on whether the *aggregate* revenues from client engagements exceed the *aggregate* costs of providing services and operating the business, including overhead expenses and their own employees' wages, salaries, and benefits.

75.    In carrying out their business, casting companies negotiate directly with clients, suppliers, and their own employees, entering into legal contracts in their own name.  They have a brand, and advertise under the company name.  They can sue and be sued.  They also engage in all of the usual tasks associated with the operation of a business, such as payroll, insurance, and accounting.

76.    There is a significant difference between services that an individual employee of the show could provide and the services that are – in fact – provided by the casting company.  In

providing casting services to clients, and competing in the casting services market more generally, casting companies rely on numerous employees and company assets.

77.     Many of the casting company's capital investments, intellectual property, and assets are not specific to a particular show, but are used in the overall operation of the business across client engagements.  Such assets do not constitute the labor of a human being, but rather the resources of an independent business.

78.     <u>Casting companies provide their own workspaces</u>.  Each casting company owns or leases its own offices.  Much of the work that casting company employees perform occurs at those offices or locations selected by the casting company, and not at the producer's location.  In some cases, even auditions are held at space owned or leased by the casting company.  For example, Telsey & Co.'s standard contract states that it "shall have the option to use its own audition space, and charge an hourly rate to the producer," thereby profiting as landlord.

79.     <u>Casting companies own their own databases</u>.  Providing casting services requires that casting companies develop and use their own non-show-specific intellectual property and assets, including their databases of available actors that are maintained and updated through intensive effort and capital investment.  Casting company databases constitute assets of the casting company.  They are not the personal property of the casting company's owners or its employees.  Casting company employees have access to the casting company's database and records only through the course of employment, and may not access such databases after their employment ends.  Any additions, modifications, or changes that an employee makes to the casting company's database become part of the firm's intellectual property, and remain available for use by the casting company and its other employees, even after termination of the actual author of the record.

80.   <u>Casting companies employ their own employees</u>.   Casting companies employ numerous individuals, such as casting directors, casting associates, casting assistants, researchers, interns, administrative assistants, receptionists, and other staff.   None of these individuals are employees of the producer.   They are employees of the casting company, working at its direction for the benefit of the firm, and only *indirectly* for the benefit of its clients.

- Casting company employees are not hired for particular shows, but remain long-term employees of the casting company, and may be assigned freely by the casting company to work on any of the firm's engagements.

- Casting company employees do not enter into separate contracts or side agreements with the producer to provide services on particular engagements. Rather, the producer depends solely on the casting company to control its own workers to fulfill its obligations under the contract.

- Casting company contracts expressly state that the casting company employees assigned to a client engagement "shall in all events be under the direct supervision" of the principal casting director, not the producer.

- Casting companies also have human resources issues with their own employees, and make hiring and firing decisions for their own businesses.[18]

81.   Compensation for each casting company employee – including any wages, salaries, or benefits – is set solely by the casting company without approval or involvement by the producer.   Such employees are paid regular salaries that do not depend on the revenues received by the casting companies under particular casting services contracts.   Neither casting companies nor their staff are treated as employees by the producer in its books of record, or for payroll or tax purposes.   Rather, the casting company itself is responsible for withholding any taxes and reporting income of its employees to the IRS.

82.   The same is true for the principal casting director.   Principal casting directors may be owners or employees of their casting companies, but they are not employees of the producer.

---

[18] *See* bway.ly/xawyp#http://variety.com/2017/legit/news/casting-director-fired-sexual-misconduct-1202627410.

They do not have direct contracts with producers in their own name, and do not receive any salary or wages from the producer.  Principal casting director-employees receive salaries from the casting company.  Principal casting director-owners share in the profits and losses of the casting company.  They invest their own capital and commit their own personal services to the operations, management, and business of the firm.

(2)   Casting Companies Engage with Producers as Vendors or Independent Contractors.

83.    Casting companies have large client lists and accept multiple, simultaneous engagements, with many shows in development and running concurrently.  For example, Telsey & Co. is a designated casting company for at least 12 current productions; Tara Rubin Casting is the designated casting company for at least 8 productions.

84.    In most cases, an independent production company is created for each Broadway production.  Consequently, casting companies generally do not work steadily for the same production company over long periods of time, but rather solely for the run of the show and, under a bargained-for right of first refusal, for any subsequent North American tour of the show.

85.    While principal casting directors are considered rain-makers, enabling them to work on new projects by developing close relationships with directors and producers, there is no commitment or expectation that a particular casting company or casting director will be selected on any particular new project.

86.    Casting companies are likewise free to accept or reject offers to provide casting services on a show-by-show basis, and do not agree to work for a particular producer indefinitely or for any fixed period, but rather just for the length of the show itself.  Casting company contracts are also "non-exclusive," and expressly state that the casting company may "engage in

other similar activities while performing services for Producer provided such activities do not adversely affect [the casting company's] ability to perform" its obligations.

87.     While casting companies are free to take on additional work from any number of clients as they see fit, a producer has no authority to assign an additional show or project to a casting company that was contracted to provide casting services for one of the producer's other shows.   The casting company retains full discretion to accept or reject an offered show.   If accepted, a new, separate contract with the producer would govern the casting company's provision of services for the second show.

88.     Like many vendors, casting companies are paid on a job performed basis.   Fees usually consisting of a fixed initial fee for each contracted-for pre-production service (*i.e.*, reading, workshop, etc.), and a weekly maintenance fee thereafter, regardless of the number of casting company employees or amount of work required to fulfill contractual obligations. Casting companies do not work to a budget and then stop, but rather must perform all usual and customary services required to cast the show at their own risk.

89.     Many casting company contracts include express provisions making it clear that the casting company is an independent party and acting as an independent contractor.   For example, a standard contract used by defendant Tara Rubin Casting defines Tara Rubin Casting as "Contractor" and contains the following provisions:

INDEPENDENT PARTIES

It is expressly understood that this Agreement does not constitute, nor shall it be construed as constituting, a partnership or joint venture between Producer and Contractor….

INDEPENDENT CONTRACTOR; EMPLOYER'S LIABILITY

Contractor hereby warrants and represents that Contractor has the right to enter into this Agreement, and to furnish the services of Rubin and ***other employees and representatives of Contractor***….   Contractor hereby agrees to hold Producer

30

> harmless against any liability … with respect to … the services of Rubin and all other employees and representatives of contractor ….

Other casting company contracts refer to the casting company as an "agent" of the producer. None, however, refer to the casting company, the casting director, or any employee, representative, or associate of the casting company as an "employee" of the producer.

90.     None of the indicia of an employment contract are reflected in the casting companies' contracts with producers.  Casting companies, for example, are not treated as employees for tax purposes.  Their compensation is not subject to withholding for income, and social security taxes and is not reported on W-2 forms.

91.     Casting companies have considerable, if not complete, discretion in the performance of their obligations under their contracts.

92.     The casting company contracts merely require the casting company to perform its obligations on the specific show with the ordinary degree of skill and care as other casting companies operating in the market.  For example, the standard contract used by Telsey & Co. simply requires that casting director will, subject to the approval of the Producer, "perform the duties customarily performed by casting directors in the business of legitimate theater."

93.     Casting company contracts do not require that the casting company perform each of those duties under the direct supervision and control of the producer.  While producers generally retain some limited rights of approval to ensure that they receive approximately what they bargained for, their approvals do not materially interfere with the casting company's business or the performance of services under the contract.

94.     Producers do not control the manner, time, or place of the casting companies' performance of services.  Casting companies are not required to utilize a certain number of staff members or devote any particular amount of time to a project.  Much of the work is conducted at

the casting company's own offices or via email or phone at the convenience and discretion of the casting company. With few exceptions (such as audition or scheduled readings, which are set to accommodate the principal casting director's schedule), neither the casting companies nor their employees are required to report for duty at any particular time or place for a particular show.

95. Casting companies engage in their own unique processes and use their own discretion to identify candidate actors. The casting company is not told how to find talent, or provided instructions concerning the fulfillment of its contractual obligations. Rather, to identify appropriate candidates for a role, a producer relies on the skills and experience of the casting company's owners and employees and the intellectual property the casting company has developed through its own efforts and capital investment.

96. Casting companies have near complete discretion to determine which junior employees will work on a project, and how to allocate responsibilities between the principal casting director and the casting company's junior employees. For example, Telsey & Co.'s standard contract requires the producer to "acknowledge[] that certain associates of Bernard Telsey may from time to time render services on behalf of the [production] provided that such associates shall in all events be under the direct supervision of Bernard Telsey."

97. Casting company employees engage in a range of activities all under the control of the casting company. As the CSA website explains:

> "Casting offices can be busy, fast-paced, and sometimes stressful places. A good Assistant is … willing to pitch in and do whatever is required to get the job done…, but generally Assistants' and Associates' work will consist of taking calls and emails from agents and managers, doing availability checks, setting up casting sessions, running the camera, uploading auditions, typing deal memos and contracts – while keeping calm under stress, and generally being as helpful as possible…. [T]his is not a 9 to 5 endeavor."[19]

---

[19] *See* www.castingsociety.com/join/getting-into-casting.

The work for a casting intern is similar.  As a leading casting company explained in an advertisement for a paid internship, a casting intern's duties include "heavy phone work, calling out and confirming appointments, putting together casting sessions, filing, tracking and documenting avails, **data entry**, Starbucks runs, etc."[20]

98.    The casting company is also responsible for organizing and conducting auditions and other casting duties required by the actors' union.  This includes selecting and arranging audition spaces, studio rentals, audition readers, audition monitors, and other services required to hold a suitable audition.  The casting company sets the location, and determines the schedule for the audition.  Indeed, casting company employees are often the only attendees associated with the show at open call auditions, leaving them in complete control over the audition process, from scheduling to selecting potential candidates for the next round.

99.    In holding auditions and providing other casting services required under the contract, casting companies are reimbursed for certain out-of-pocket costs.  For most costs, the producer does not pay those costs in the first instance (for example, on a company credit card, or by issuing a check directly to the third party), but merely reimburses the casting company for such expenses.  For example, the standard contract used by Telsey & Co. notes that the "[p]roducer agrees to reimburse Casting Director for any photocopies, postage, messengers, audition studio rental, audition readers, audition monitors, transportation to/from auditions and meetings, client food/beverages, and other expenses incurred on behalf of the [production]."

100.    The casting companies may also charge producers fees for certain costs that are not incurred solely with respect to the particular show but rather are fixed costs of the casting

---

[20] *See* www.playbill.com/job/casting-intern-immediate-hire/0000015f-9317-dc49-a37f-ff1748530000?q=casting&category=&date=&state=&paid=&union=%E2%80%A6.

company.  For example, the standard Telsey & Co. contract requires the producer to pay a fixed "per week fee for long distance phone, fax, computers, and Internet use during the audition process and run of the show."  The same contract also requires the producer to pay a fixed hourly rate for videotaping auditions, regardless of the actual hourly cost the casting company incurs in providing (or subcontracting for) video services.  That contract also allows the casting company to charge an hourly rate for use of its own audition facilities.  Such charges are not wages, salaries, or compensation for the labor of a human being.

> b.    *The Casting Cartel's Fictitious "Employee" Label Is a Sham.*

101.    Recognizing that independent businesses cannot unionize, the casting cartel engaged in a concerted effort to change the label governing the relationship between the producer, on the one hand, and the casting company and its employees, on the other.  Central to this effort was the creation of a new proposed contract for all new productions.  This proposed agreement would involve a change in name only.  It did not involve any change in the actual commercial practices of the parties, just the insertion of the fictitious label "employee" into the new agreements.  That plan was a sham.

102.    The plan began with an agreement by each casting company to exit the business of entering into new contracts directly with producers.   As Mr. Telsey explained, the terms of the "past collaborations … are no longer satisfactory," and "[i]nstead, I prefer to work directly for the producer as an employee."  Because casting companies would no longer provide services *directly* to producers under their own contracts, the casting cartel believed that producers would be forced to enter into "Agreements of Employment" with principal casting directors, signing the agreements in their own names.  This concerted refusal to deal, however, required the agreement of non-labor groups, namely the casting companies' agreement to no longer accept new business.

34

103.   Having secured this agreement, principal casting director-owners presented producers with their proposed new production casting agreement.  This agreement was initially presented in the October 2017 Deal Memo, described above.  But the Deal Memo did not clearly specify whether the Casting Director signatory was supposed to execute the agreement as owner or agent of the casting company or in his or her individual capacity.  Two weeks later, multiple casting director-owners presented an identical revised version of their new production casting agreement, titled a "Personal Services Agreement," apparently to clarify that ambiguity.

104.   The Deal Memo purported to be an "Agreement of Employment" between the "Casting Director" and the "Producer."  The word employment, employer, or employee does not appear elsewhere in the proposed agreement.  Likewise, the Personal Services Agreement merely defines the producer as the "Employer."  The sole reason for including the words "employment," "employer," or "personal service" in these proposed agreements was to try to shield the casting cartel's concerted action from the antitrust laws.

105.   The casting cartel did not intend that the label change itself would have any practical effect on the nature of the services provided under the contract.  The draft "Personal Services Agreement," for example, expressly states that the "description of duties in [the Agreement] are not intended to, nor shall be construed as to enlarge or diminish the professional duties performed in theatrical producers produced for Broadway or intended to be produced for Broadway."

106.   Under the proposed new agreement, the casting service provider continued to bear all the indicia of an independent contractor relationship.  The casting service provider would continue to be paid on a job performed basis, and not based on the amount of work required.  The contract would continue to be non-exclusive, permitting the casting service provider to work

on multiple projects simultaneously.  And the contract would still vest all discretion – subject to the same approvals as under the current contracts – in the performance of services to the casting provider.

107.    Similarly, the casting cartel expected that the alleged "employees" would continue to provide services by utilizing the casting company's employees, assets, and resources, even if those companies would no longer be signatories to the proposed new agreements.  The draft Personal Services Agreement, for example, continues to state that, "certain casting associates [of the casting director] may from time to time render services on behalf of the production provided that such associates shall in all events be under the direct supervision of the Casting Director," and that the producer must agree to reasonable requests concerning the casting company's "utilization of [its] casting associates."

108.    The casting cartel also did not intend that the current employees of casting companies would suddenly become direct employees of the producers.  Other than a casting director named in the agreement, the remaining employees of the casting company would continue to perform the same services at the direction of and for the benefit of the casting company.  The Personal Services Agreement, for example, does not purport to:

- Hire casting company employees as employees of the producer;

- Pay casting company employees;

- Require casting company employees to provide services for the producer;

- Place casting company employees under the ultimate control or supervision of the producer.

109.    Casting companies did not take steps to change their operations or business models to reflect the supposed change in legal status of principal-casting directors from owners of the company to "employees" of the producer.  The casting companies did not announce plans

36

to go out of business, wind down their affairs, transfer their assets (or liabilities) to others, or announce to their employees that they would no longer be accepting, or providing services for, new engagements.  The casting companies also did not enter into side agreements with producers or casting directors to make available the assets, employees, or resources of the company pursuant to the Personal Services Agreements.  Likewise, the principal casting directors did not take steps to change their methods of doing business to reflect the supposed change in legal status from owners/employees of the casting company to "employees" of the producer.  They did not resign as employees or sell their ownership interest in their casting companies.  Nor did they take steps to avoid conflicts of interest between themselves and their casting companies with respect to future engagements.

110.    In short, the casting cartel simply attempted to effectuate a label change and nothing more.

2.    The Unilateral Conduct Ruse:  Casting Companies Say Common
Appointment of the Teamsters as "Agent" Is Just a Coincidence.

111.    After the boycott began, and it became clear that antitrust issues would lie at the heart of the parties' dispute, the casting cartel decided they needed a fallback position in case their fictitious label scheme did not pan out.  The casting cartel met to develop a new ruse.  Its new plan was to disclaim any conspiracy.  Despite a year of public concerted action, including "job action" threats and directives to act "in solidarity," the Teamsters believed that they could still get their foot in the door – without antitrust liability – if it could make it appear that each casting director *coincidentally* appointed the Teamsters as his or her individual agent.

112.    To carry out this ruse, the casting cartel included a provision in the Personal Services Agreement stating that the "parties recognize the right of the other party to designate one or more representatives to assist them in the negotiation and administration of this

37

Agreement," and that "[n]either party has the right to interfere with the other party's selection of such representative(s)."

113.    The purpose of this provision became clear in a November 1, 2017 letter from the Teamsters' outside counsel, Stuart Davidson, who wrote:

> "It is simply not correct … that Local 817 and casting directors are 'now engaging in a concerted refusal to independently negotiate with Broadway producers…. To the contrary, so far as I am aware, the casting directors … have at all times, been willing to enter into such negotiations, albeit with the assistance of both Local 817 and their individual agents…. I am not aware of anything in the law that allows you to designate who can represent a casting director…."

Despite Mr. Davidson's representations, the casting directors have indeed engaged in a concerted refusal to independently negotiate with Broadway producers. The casting companies and casting directors considered "their hands tied" as they had "all agreed" not to take on new work unless the producers agreed to their collective demands.

114.    Belying the notion of unilateral conduct, the casting companies then sent producers identical versions of the Personal Services Agreement, differing only in the font used. The casting companies also began to individually inform the producers that the Teamsters would be their negotiation agent ***solely*** for purposes of negotiating the casting cartel's collective demands, including the demand for a fictitious label change and a 29% surcharge, and that they would have different "personal" agents for non-cartel commercial demands. For example, on October 27, 2017, David Caparelliotis, founder of one of the major Broadway casting companies, informed a producer that he will be "represented by the Teamsters Local 817 (as well as my personal agent)," and in a follow-up email, his personal agent made clear that he would continue "to be the person … dealing with anything fee/maintenance/house seat/etc related," while the Teamsters would be the agent for "health, pension, and other details of a deal to engage David's services as an employee of the production." Other casting directors, as well as

Teamsters' outside counsel, Stuart Davidson, explained that the Teamsters were only seeking to handle discussions relating to the cartel's demands for a label change and a fee surcharge.

115.   This common conduct was part of the conspiracy; it was not unilateral.

## VI.   ANTICOMPETITIVE EFFECTS AND INJURY

116.   The casting cartel threatens to substantially lessen and restrain competition in the market for casting services on Broadway, and, unless enjoined, will cause substantial anticompetitive effects and irreparable injury.   The immediate anticompetitive effects of the conduct include inflated casting services prices, arising from the casting cartel's demand for a 29% surcharge.   As result of the current and continuing boycott, producers will also be deprived of the benefits of choice in the selection of casting companies on a competitive basis.   To the extent that the casting cartel intends any changes in the commercial relationship as a result of their attempted change in legal status – such as the unavailability of the assets, resources, and employees of casting companies – the proposed new casting agreements' anticompetitive effects would also include reduction of quality and output.

117.   Future anticompetitive effects are likely to be even greater.   Unless enjoined, the casting cartel intends to eliminate all or most price competition in the Broadway casting services market through imposition of fixed fee scales for services, prohibitions on the use of non-conspiring casting providers, and other service-related rules.

118.   Such future anticompetitive effects are reasonably anticipated.   In the Teamsters' efforts to cartelize the Hollywood film and TV casting services market, the Teamsters initially limited their requests to health and retirement benefits.   In the decade since, the terms and conditions have become increasing onerous and the degree of competition among the film and TV casting directors has substantially declined.

## VII.   COUNT I:  SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

119.   The Broadway League incorporates each and every paragraph of this Complaint as if fully set forth herein.

### A.   *The Sherman Act Violation*

120.   The defendants reached agreements and participated in a conscious commitment to a common scheme in order to create, enhance, aggregate, or exploit their collective market power in the market for casting services for Broadway productions.

121.   This scheme included one or more unlawful contracts, combinations, or conspiracies in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The unlawful agreements constitute violations of Section 1 of the Sherman Act under the per se rule and the rule of reason.

122.   The unlawful agreements included agreements among the defendants and their coconspirators to: (i) eliminate price competition among casting companies; (ii) raise, fix, or inflate the prices that casting companies charge for their services, including by imposing a surcharges on top of any negotiated fees; (iii) engage in a concerted refusal to deal, or group boycott, of any producer that did not agree to one or more demands collectively agreed-upon by the defendants; and (iv) take such other steps as may be necessary to carry out the agreement.

123.   The defendants and their coconspirators engaged in overt acts in furtherance of their unlawful agreements.   As described more fully above, these overt acts included: (i) recruiting additional people or entities to join the conspiracy; (ii) causing defendant Casting Society of America to issue directives to casting professionals to implement or carry out the conspiracy; (iii) causing the Teamsters to demand that the Broadway League negotiate with the defendants on a collective basis; (iv) organizing and orchestrating a public campaign designed to exert commercial pressure on producers who did not accede to the defendants' demands; (v)

demanding surcharges on negotiated casting fees and improperly describing them as welfare and benefit contributions; (vi) refusing to deal with producers of new shows, except on terms that were collectively agreed upon by the defendants; (vii) refusing to allow the individual casting companies to enter into any new contracts with producers in their own name; and (viii) such other acts as may have facilitated the implementation, enforcement, and/or monitoring of the unlawful agreements.

124.    To the extent a relevant market must be defined, the relevant market consists of casting services for commercial Broadway theatre productions, related national tours of such productions, and productions in development that are intended for Broadway.  A hypothetical monopolist of Broadway casting services could profitably impose a significant, non-transitory price increase on customers of such services.  There are no reasonable substitutes for Broadway casting services, as each Broadway production must have a cast, which in turn requires casting services.  The market is characterized by substantial barriers to entry, including the need to develop and have access to a reliable database of available actors, and the need to develop strong relationships with actors, agents, producers, and directors.  The defendant casting companies possess market power, collectively controlling over 75% of the relevant market.  Acting in concert, the defendants have the power to control price and exclude competition.

125.    The unlawful agreements restrain trade by preventing price competition among defendant casting companies, increasing the price or cost of casting services, reducing the choice of casting companies that a producer may select, reducing the quality of services that are available for Broadway productions, and increasing the barriers to entry or expansion for actual or potential competitors in the casting services market.

126.    There is no procompetitive justification for the conduct alleged.  Defendants do not seek, through their conduct, to integrate resources, achieve economies of scale, provide greater choice, improve quality, increase output, or reduce the cost of casting services.

127.    The unlawful agreements and the overt acts undertaken or threatened in furtherance of them have occurred within the flow of, have substantially affected, or threaten to substantially affect, interstate commerce.

128.    As a direct and proximate result of defendants' unlawful conduct, the Broadway League and its members have suffered, and are threatened with, substantial irreparable injury. The elimination of competition arising from, and made possible by, defendants' unlawful agreements will cause direct and proximate damage to producers in the form of inflated prices, reduced choice, or reduced quality for casting services, and may cause producers to lose profits from shows that may not be financially viable under the terms and conditions demanded by the defendants pursuant to their unlawful agreements.   The unlawful conduct will also cause substantial irreparable injury to League members, including producers, directors, theatre owners, and general managers to the extent that the conduct alleged herein may impact that nature of the casting services provided, the availability of casting services, or the financial viability of any Broadway production.  The conduct will also cause direct and proximate injury to the Broadway League as the recognized collective bargaining agent of its members, since it has expended, and would need to expend, resources negotiating agreements with casting companies and/or the Teamsters if the unlawful conduct continues.  The effects described in this paragraph interfere with the Broadway League's mission to support its members in making Broadway productions available to audiences at affordable prices.

42

**B.**   ***The Conduct Falls Outside the Limited Antitrust Labor Exemptions***

129.   The conduct alleged herein is not immune from the antitrust laws under either the statutory or non-statutory labor exemptions.

130.   The unlawful agreements directly impact the business market for casting services provided by casting companies, not terms and conditions of employment.   The defendants' conspiracy does not involve the labor of a human being.   The unlawful agreements, instead, specify the terms on which the casting companies will, or will not, provide casting services, including terms fixing the prices for casting services.   As such, the anticompetitive effect on the casting services business market is immediate, substantial, and direct.   The impact, if any, on the actual wages of the employees and owners of the casting company conspirators is indirect.

131.   The agreements between the Teamsters, casting companies, and their co-conspirators are ineligible for any antitrust immunity because the casting companies are non-labor groups.   They are independent businesses competing in the market for casting services as vendors or independent contractors.   They are not employees of the producers.

132.   The defendants' attempt to label themselves "employees" does not make the cartel eligible for antitrust immunity.   The purported label change is a sham and does not reflect the commercial nature of the relationship between the casting service provider and the producer. The attempt to effectuate a label change also falls outside any antitrust immunity because it involves a conspiracy with non-labor groups, namely the casting companies' agreement to not accept any new production casting agreement in its own name.

133.   There is no job or wage competition or economic interrelationship between the casting companies, on the one hand, and any employee of any producer, on the other.   Producers contract directly with casting companies, not with the employees of casting companies.   There are no unionized casting provider members that contract directly with any producer.   As such,

there is no job or wage competition between any casting company and any employee of a producer.

134.    There is no job or wage competition between the casting companies, on the one hand, and any casting company employee on the other.  Because casting companies control their own employees, they are not in competition with those employees for purposes of contracting with producers.

135.    The defendants' conduct does not arise in the context of any collective bargaining agreement.  The Teamsters have neither been certified by the NLRB nor recognized by any Broadway producer as the bargaining representative for employees of the casting companies or for casting directors; indeed, defendants have not sought to organize employees of casting companies for the purpose of collective bargaining with those companies.

## VIII.   PETITION FOR RELIEF

136.    WHEREFORE, Plaintiff The Broadway League Inc. petitions that:

     a.    The conduct alleged herein be declared, adjudged, and/or decreed to be unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

     b.    The court issue such injunctive and equitable relief as may be necessary to prevent and restrain the Defendants from engaging in further or ongoing unlawful conduct in violation of Section 1 of the Sherman Act;

     c.    Plaintiff The Broadway League Inc. be awarded costs of suit, including reasonable attorneys' fees, as provided by law; and

     d.    The Court order such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper.

Dated:  December 5, 2017

/s/ *Bernard M. Plum*
Bernard M. Plum
David Munkittrick
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
T:  212-969-3000
bplum@proskauer.com
dmunkittrick@proskauer.com

Colin R. Kass (*pro hac vice forthcoming*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
T:  202-416-6800
ckass@proskauer.com

*Attorneys for Plaintiff*
*The Broadway League Inc.*

45