I2s9broc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

THE BROADWAY LEAGUE INC. ,

                    Plaintiff,

          v.                              17 CV 9515 (GHW)

BERNARD TELSEY CASTING, INC.,
ET AL.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          February 28, 2018
                                          4:02 p.m.

Before:

                    HON. GREGORY H. WOODS

                                          District Judge

                    APPEARANCES via Speakerphone

PROSKAUER ROSE LLP
     Attorneys for Plaintiff
BY:  COLIN R. KASS
     DAVID A. MUNKITTRICK

BERGER & MONTAGUE, P.C.
     Attorneys for Defendants
BY:  MICHAEL C. DELL'ANGELO
     SARAH SCHALMAN-BERGEN

I2s9broc

| | |
|---|---|
| 1 | (In chambers) |
| 2 | THE COURT:  This is Judge Woods.  Do I have counsel |
| 3 | for plaintiff on the line? |
| 4 | MR. KASS:  You do, your Honor.  This is Colin Kass and |
| 5 | David Munkittrick, along with our legal assistant, Chelsea |
| 6 | Tureano, from Proskauer Rose. |
| 7 | THE COURT:  Thank you. |
| 8 | Do I have counsel for defendants on the line? |
| 9 | MR. DELL'ANGELO:  Yes, your Honor.  This is Michael |
| 10 | Dell'Angelo, along with my partner, Sarah Schalman-Bergen, from |
| 11 | the law firm of Berger & Montague. |
| 12 | THE COURT:  Good.  Thank you very much. |
| 13 | I scheduled this conference in order to discuss the |
| 14 | discovery dispute that the parties have brought to the Court. |
| 15 | I've read the letters submitted by the parties.  I still would |
| 16 | like to give each of you the opportunity to present any |
| 17 | additional arguments that you'd like to the Court. |
| 18 | I'd like to divide the issues into two pieces.  First, |
| 19 | I'd like to discuss the issue related to the requested |
| 20 | discovery from Carnahan Casting and Stewart/Whitley Casting; |
| 21 | and second, I'd like to discuss the issue with respect to |
| 22 | general discovery from all defendants and the timing of its |
| 23 | production. |
| 24 | Let's begin with the first topic.  Counsel for |
| 25 | plaintiff, can I hear from you, please. |

I2s9broc

1          MR. KASS:  Yes, your Honor.  So, discovery in this

2     case began about a month ago.  Actually, it began on January 10

3     when we served our discovery requests.  And then it's been now

4     almost a full month since our January 31 status conference

5     where the motion to stay issues were addressed.

6          During that motion to stay proceedings there were

7     discussions about discovery from each of the defendants

8     including whether there should be discovery based on the

9     sufficiency of the allegations under Twombly.  And the Court, I

10    think, allowed us to proceed with discovery and denied the

11    motion to stay.

12         So, following that we sent letters to the defendants

13    identifying certain information that we thought should be

14    highlighted as part of the initial productions, and one of the

15    issues was documents from Stewart/Whitley Casting and Carnahan

16    Casting based on their allegations that they weren't involved

17    in the cartel.  And our belief was that they were, and we've

18    alleged -- we've alleged that they were.

19         Their response back was that they should be exempt

20    from discovery or subject to some lesser degree of discovery

21    because they don't think the allegations satisfy Twombly.

22         When we pointed out that they had made a decision in

23    litigating the motion to stay to go for all or nothing and

24    treat all the defendants the same, that once that motion to

25    stay had been denied, that for purposes of the complaint there

I2s9broc

1    is no difference between Carnahan and Stewart/Whitley versus

2    the other casting companies that are out there.  They're all

3    alleged to be cartel members.

4           The response we got back was:  Well, under the rule of

5    proportionality they effectively can achieve the same stay

6    because the allegations they believe were too thin to support

7    discovery from these defendants.  And I think our point for

8    that was that that's flawed for both, two reasons, one legal

9    and one factual.

10          Legally our view is that the rule of proportionality

11   does not allow parties that think the allegations in the

12   complaint aren't sufficient to survive Twombly a basis to avoid

13   discovery once the Court has allowed discovery to proceed.

14   And, for example, it would seem hard to believe that the rule

15   of proportionality would say that documents relating to a

16   cartel member's participation in the cartel is not proportional

17   to the needs of the case in a cartel case.

18          And, likewise, when the allegation or the issues in

19   the case are whether the defendants operate as employees of

20   producers and are somehow subject to antitrust exemption, that

21   documents relating to how they operate and whether they are

22   employees or not is not proportional to the needs of the case.

23          So our view is that the rule of proportionality does

24   not give the Carnahan Casting and Stewart/Whitley Casting some

25   exemption or lesser role in the case with respect to discovery

I2s9broc

1    versus the other casting companies.  That's legally.

2            Factually, what we know is that both Carnahan Casting

3    and Stewart/Whitley Casting were involved in the alleged

4    cartel.  We don't have from the defendants, because they have

5    not yet produced any of their documents other than the union

6    cards, but the Teamsters affiliate, JC 16 or Joint Council 16,

7    has produced some of their documents.  And they're not parties

8    to the case, and they're represented by separate counsel, but

9    they did make a production.  And it appears that their main

10   role was through their director of communications who was

11   responsible for much of the PR campaign.  So we have some of

12   the PR documents, not as many of the underlying cartel

13   documents in terms of the boycott because the JC 16 wasn't

14   involved -- as involved in that aspect of it.

15           But we do know from that production and from the union

16   cards that both Carnahan Casting and Stewart/Whitley Casting

17   entered into an express agreement to appoint the Teamsters as

18   their negotiation agent, which is one of the things that we are

19   alleging is unlawful under the antitrust law.  The actual

20   agreement to appoint the Teamsters as the joint negotiation

21   agent is something that we are challenging.

22           We also know from the Joint Council 16 production that

23   both Carnahan Casting and Stewart/Whitley Casting were involved

24   in the PR campaign, provided support to that, and that there

25   were industry meetings to discuss the boycott.

I2s9broc

1              Now we don't yet have the full list of people that

2      were at those industry meetings.  But we do know that there

3      were industry meetings and that they were -- that as part of

4      those industry meetings it was on behalf of or supposed to be

5      all casting directors were supposed to attend.

6              So our belief is that even if -- even if it weren't

7      true as a matter of law that the rule of proportionality

8      doesn't give them an exception to discovery, that the facts

9      here are more than sufficient to require discovery from

10     Carnahan Casting and Stewart/Whitley Casting on the same basis

11     as all other casting cartel members, alleged casting cartel

12     members.

13             And then the last part of our request was that they

14     produce certain documents within two weeks.  And those

15     documents that we're requesting are the documents that they say

16     either don't exist or they don't have any document -- many

17     documents, which is their communications with the other

18     defendants relating to these events.  If they weren't involved,

19     it shouldn't be a big burden and we believe that they should be

20     able to produce that promptly, especially when you consider

21     that the Joint Council 16 was able to produce within 30 days

22     eleven thousand documents or eleven thousand pages of documents

23     without much problem, and it's now been over 40 days, probably

24     45 days since we issued our document requests to the defendants

25     and all we have at this point from them are the union cards.

I2s9broc

1          So we believe that it should be possible for them to

2     produce the documents relatively quickly.

3          THE COURT:  Good.  Thank you very much, counsel.

4          Let me hear from counsel for defendants on this issue.

5          MR. DELL'ANGELO:  Thank you, your Honor.  This is

6     Michael Dell'Angelo speaking.

7          Although we don't agree with much of what was just

8     said, I will say that it was productive to the extent that it

9     is really the first discussion that has happened between the

10    parties that substantively gets to proportionality.  What I

11    don't think it does is gets over the hump with respect to the

12    requests for discovery that the plaintiff is seeking here.

13         Now, to be clear, defendants Carnahan and

14    Stewart/Whitley have been cognizant from the outset that on

15    January 31, 2018 at the hearing before your Honor, that your

16    Honor did not stay discovery as to them.  So it is not and has

17    not been their position since the denial of the motion to stay

18    discovery that they're not obligated to participate in

19    discovery.  They're prepared to and they have made a proposal

20    to produce documents, which I'll address in a moment.

21         What I do think, what we do believe, your Honor, is

22    that the plaintiff is intent on declaring impasse and deprive

23    the parties of the ability to meaningfully meet and confer

24    about what is proportional and why.

25         So, some stage setting, if you will.  We do not

I2s9broc

1      believe that the same scope of discovery with respect to

2      Carnahan and Stewart/Whitley is appropriate as to the same

3      scope as the other casting director defendants.  And a plain

4      reading of the complaint demonstrates why that is so.

5             So, Carnahan and Stewart/Whitley are mentioned

6      collectively three times in the complaint; in paragraphs 17 and

7      20 which are the party averments, and then the only other

8      mention is in paragraph 23, in the simple conclusionary

9      sentence that says that the individuals, Benton Whitley and

10     Carnahan, not the companies themselves, were, quote,

11     coconspirators.  And there's absolutely nothing else in the

12     complaint that suggests that they participated in the conduct

13     at issue.

14            And what is particularly important we think, if you

15     look at paragraph 68 of the complaint, your Honor, it expressly

16     excludes these defendants from any participation in the

17     boycott; that is, the complaint acknowledges that neither

18     Carnahan nor Stewart/Whitley participated in the alleged

19     boycott.

20            That is important because the case is being brought by

21     the Broadway League.  The Broadway League has alleged and holds

22     itself out as an organization that consists of over 700

23     members, including essentially every producer and general

24     manager who runs shows on Broadway.  And so if Carnahan or

25     Stewart/Whitley had taken steps in furtherance of the alleged

1    conspiracy, have tendered the alleged CSA, had demanded a price

2    increase, had demanded health benefits or the alleged

3    29 percent contribution for health and welfare benefits, or had

4    boycotted the show, surely the league's 700-plus members would

5    have been able to communicate that information to the league.

6    And in particular if you look at the -- some of the exhibits

7    that we've submitted in support of our letter, at Exhibits 26

8    and 27, there are letters from the plaintiff that identify --

9    excuse me, 25 and 26, your Honor -- that specify the source of

10   allegations in the complaint, having come from producers or

11   general managers where there are allegations of having tendered

12   a CSA or allegedly having boycotted.  Now we have issues with

13   those.  But what it does illustrate with respect to these

14   defendants is that not a single league member complained of

15   anything that these people did.

16        So we do think under Twombly this complaint won't be

17   upheld with respect to these defendants.  But, again, we're

18   also mindful that the Court elected not to stay discovery and

19   that these defendants have to participate in discovery.  They

20   are prepared to do that.

21        But, their participation in discovery is also, as we

22   have said over and over again in attempting to try to resolve

23   this issue with the plaintiff, is that the scope of discovery

24   that Carnahan and Stewart/Whitley are subject to is governed by

25   Rule 26(b)(1).  26(b)(1) plainly requires that discovery has to

I2s9broc

1    be relevant to a claim or defense and proportional.  And there

2    are a number of proportionality factors which we layout, none

3    of which, in our letter, none of which, I think, favor the

4    plaintiff's request here.

5             And it is important to put that into context.  Because

6    what we did, your Honor, with respect to Carnahan and

7    Stewart/Whitley is offer to produce relevant communications,

8    their relevant communications with other defendants about

9    commercial Broadway productions that concerned the alleged

10   efforts to unionize, the alleged PR campaign, and alleged

11   efforts to negotiate client engagement terms or to obtain

12   health and benefits from producers.

13            So what we did was we expressly offered to produce

14   communications from these defendants to get to the heart of the

15   case.  The League and none of its 700-plus members can identify

16   a single thing that they allegedly did.  Notwithstanding that,

17   because they have to participate in discovery, we said what is

18   proportional is a production of their documents that goes to

19   the heart of the complaint.  And if those documents show that

20   more is wanted we have a discussion about producing more.  But

21   that was not sufficient.  We believe that what we have proposed

22   is proportional under 26(b)(1) for a number of issues.

23            The first factor is:  What are the issues at stake?

24   Well the issues at stake with respect to Carnahan and

25   Stewart/Whitley are questionable at best because they haven't

I2s9broc

1    actually been alleged to do anything or they actually directed

2    any unlawful conduct when you look at how bare the complaint

3    is.  The second factor is the amount in controversy.  There is

4    no amount in controversy with the exception of the plaintiff's

5    request for its own legal fees.  What they're seeking here is

6    an injunction, and I do not think that that favors -- the

7    amount in controversy factor favors broad, expansive and

8    expensive discovery.  The third factor is whether or not the

9    plaintiff has access to the information that it needs.  And, as

10   I've explained, it has a tremendous access to information from

11   its own 700-plus members which shows nothing.  We've also

12   offered to produce the relevant communications that I have

13   outlined.  And importantly it has received, as you've heard,

14   your Honor, information from the Joint Council and the

15   Teamsters.  And let me -- the international Teamsters -- as

16   well as the union cards.  And let me pause there for a minute

17   to say that I do not think that the union cards or, as they put

18   in their letter participation in a social media campaign,

19   constitutes participation in a conspiracy.  Signing a union

20   card is signing a union card.  We have a difference of opinion

21   on that.  But, again, the scope of communications that we've

22   agreed to provide will provide the answer and if more discovery

23   is warranted more discovery can be had.

24           But if merely participating, for example, in a social

25   media campaign were enough, the Court will soon find that there

I2s9broc

are a number of people who participated in a social media

campaign, not the least of which are people like Robert De Niro

and Bette Midler, and I don't think anybody is suggesting that

they were coconspirators or should be subject to the kind of

broad and expansive discovery that's at play here.

Fourth, there is the relative resources of the

parties.  It's it is clear from how this case is being

litigated and the fact that the League chose to bring this case

as it did, rather than seek some immediate relief, that it is

committed to spending millions of dollars to litigate this

case.  Whereas, Stewart/Whitley and Carnahan are relatively

limited in resources, and broad and expansive discovery of the

type that they're seeking, these 110 requests as to each

defendant, would be incredibly burdensome and incredibly

expensive.

By way of example, just one of the custodians that

we've collected from these defendants has over a terabyte of

data.  Just the cost of collecting, processing, storing that

data is incredibly expensive.  Then reviewing it with the scope

that the plaintiff wants simply magnifies the cost for little

to no incremental value when they're getting the types of

documents that we've offered that would get to the heart of the

case.

And the next factor is -- and I just would add the

type of discovery that they're seeking includes, for example,

I2s9broc

1    five years of tax returns.  I don't think that five years of

2    tax returns from defendants about whom nothing has been --

3    nothing has been alleged is warranted under the circumstances

4    when they would get what they want.  And when you consider the

5    cost issue, what we did say to the League is that if it wants

6    more than we're offering, which we think is what is necessary

7    for them to prove their claim, if there's anything to prove

8    based on this discovery and is proportional under Rule

9    26(b)(1), we will entertain it if they are willing to pay for

10   it and they were unwilling to do that.

11        Finally is whether or not the burden and expense

12   outweighs the benefits.  And I think it's, as I articulated, it

13   does not here because the League would be getting what it needs

14   and if it needs more it can get it.

15        I'd just lastly, I think this point will come up a few

16   times so I'd like to emphasize it.  The limited production of

17   eleven thousand or so documents from the Joint Council and the

18   Teamsters International is not really a proxy for the

19   productions here.  We've looked at those productions carefully.

20   There is a tremendous amount of duplication.  They were clearly

21   collected and produced in haste in a way that they don't

22   comport with the complicated and sometimes onerous requirements

23   of ESI stipulation that the parties are in the midst of working

24   out here.  They are formatted in such a way that some e-mails

25   go on for pages, and pages, and pages which magnify the page

I2s9broc

1   count in a way that make that number not particularly

2   misleading.  And they were not responding to 110 document

3   requests the way these defendants would be.  So I just don't

4   think that it is a meaningful proxy for what these defendants

5   are being asked to do.

6           But all that said, your Honor, I think that Carnahan

7   and Stewart/Whitley are quite well aware that they're subject

8   to discovery.  They're willing to participate in it.  They've

9   made a reasonable proposal for the production of documents to

10  get the plaintiff what it needs at this stage, are open to

11  providing more if necessary, and their proposal is imminently

12  proportional under 26(b)(1).

13          THE COURT:  Thank you.

14          Counsel for plaintiff, what's your view?  First, do

15  you believe that there are grounds for the parties to work

16  together to develop a more narrow set of requests for this set

17  of defendants, mindful of the proportionality requirements

18  which have been in the rules and which have been relocated in

19  the 2015 amendments to underscore their significance?

20          Is there any ground do you think for the parties to

21  discuss a more limited set of requests from these defendants on

22  the basis of proportionality?

23          MR. KASS:  So let me address that and let me step back

24  for one second.

25          Our view here is that Carnahan Casting and

I2s9broc

1    Stewart/Whitley Casting are full-fledged members of the cartel

2    and the JC 16 production and the union cards establish that.

3            That said, what we are looking for is to treat them

4    the same as the other casting companies.  So, yes, we had

5    relatively comprehensive discovery requests which have been

6    objected to on a number of grounds.  We're not asking for

7    Stewart/Whitley or Carnahan Casting to do anything more than

8    the other casting companies have done.  But our view is that

9    they are actual members of the cartel.

10           Now, when you think about their offer of production

11   which came sort of at the very end of the lengthy number of

12   correspondence and meet and confers that we've had on these

13   issues, there are two issues with that.  Number one, what is

14   excluded from their offer is anything that has to do with how

15   these companies operate, which goes to the heart of whether the

16   exemption applies to them.

17           And as the Court may recall, the defendants admitted

18   at the January 31 status conference that they have to, quote,

19   run the table across all of the defendants in order for the

20   exemptions to apply.  And because Carnahan Casting and

21   Stewart/Whitley Casting had signed the union cards and have

22   expressly appointed the Teamsters as their collective

23   negotiation agent, in order for that exemption to apply, they

24   have to establish that they are, in fact, employees of

25   producers and they are not companies themselves.

I2s9broc

1          So discovery requests going to how they operate, which

2     is entirely excluded from their offer of production, is

3     certainly relevant and proportional to the case.

4          THE COURT:  Good.  Thank you.  Thank you, counsel.

5     That's good.

6          So thank you very much for your arguments here.  Thank

7     you for the letter and the arguments presented there.

8          I'd like to just make a few comments.  I think that

9     all of or I hope that all other counsel on the phone are aware

10    of this.  As you know, the 2015 amendments to the rules

11    relocated the proportionality requirements in order to

12    underscore the significance of that requirement, one that

13    existed in the rules previously but that through its movement

14    has drawn attention to it in a way that was not previously the

15    case.

16          It should be clear, however, that the proportionality

17    requirements don't allow the responding party to unilaterally

18    make decisions about what discovery it will produce based on

19    its assessment of proportionality alone.  That requirement is

20    designed to trigger a conversation between the parties and to

21    drive resolution of potential issues by the court.  But it

22    doesn't allow a party to make its own independent assessment of

23    what it is willing to provide based on its unilateral view of

24    what is proportional to the needs of the case.  Proportionality

25    is not measured by the number of times that a party is

I2s9broc

1   mentioned in a complaint, nor is it measured by defense

2   counsel's view regarding their client's respective degree of

3   culpability.  If it was, few cases would be fully litigated

4   because presumably defense counsel assume that their clients

5   are not liable or that they take at least a positive view of

6   the likely liability of their client.  So the proportionality

7   requirement does not, in my view, permit a party to

8   independently and unilaterally determine what is proportional

9   to the needs of the case.

10          The language of the defendants' objections state that,

11  "Subject to plaintiff demonstrating that the requested

12  discovery is proportional to the needs of the case with respect

13  to these defendants" they will conduct "a reasonable" custodian

14  search for "documents that are proportional to the needs of the

15  case."

16          I want to remind you, parties, too that the rules

17  provide for attorney certification of discovery responses.

18  Those certification requirements are not that you gave over all

19  the documents that you thought were proportional or reasonable.

20  The requirement is that you certify that with respect to a

21  disclosure it is complete and correct as of the time it is

22  made.  So, these caveats about giving those things that you

23  think are reasonable and that you think are proportional to the

24  needs of the case I think are not aligned with the requirements

25  of the rules.  The proportionality requirement is designed to

I2s9broc

prompt a conversation but, as I say, does not permit a party to

unilaterally determine what is proportional and what is not.

The certification requirements that counsel attest that the

response is complete and correct should make that point clear,

as should the fact that the 2015 amendments did not change this

requirement, they simply refocused it.

So to the extent that the objection to these discovery

requests is based on defendant's assessment that this point,

these individual defendants are less culpable, or less liable

and therefore that less discovery is warranted as to them, I

don't believe that that's a sufficient basis to withhold

responsive discovery.  That does not mean that I discourage the

parties from having substantive conversations about the

proportionality of your requests and custodians to be searched

and search terms to be used.  All of those are appropriate, in

fact, probably necessary given the extent of discovery here.

But the constraints on the scope of discovery should be agreed

upon by the parties or constrained by the court.  A party

cannot arrogate unto themselves the decision about what is in

their view proportionate or reasonable.

So, to the extent that the request here is that I

direct that defendants Carnahan Casting and Stewart/Whitley be

required to comply in the same manner as other defendants to

these discovery requests, I am doing so.  The basis presented

for treating them differently, namely counsel's perspective

I2s9broc

1    that they are less culpable or mentioned fewer times in the

2    complaint in my view does not provide a justifiable basis to

3    treat them differently.

4           Again, if counsel can work together to resolve on a

5    different approach you're welcome to do so.  But from my

6    perspective I'm unwilling to differentiate them from the other

7    defendants based on one set of counsel's views given that the

8    other set of counsel has a different set of views and that this

9    issue, namely decisions about proportionality, are not a valid

10   forum for litigation on the merits of the case.

11          So, to the extent that the request here is that I

12   instruct that Carnahan Casting and Stewart/Whitley be required

13   to respond to discovery in the same manner as other defendants

14   absent an agreement between counsel for the parties, I am

15   granting that request, and will turn to the second issue.

16          Counsel for plaintiff.

17          MR. KASS:  Thank you, your Honor.

18          The second issue goes to the timing of initial

19   productions of nonobjectionable documents.  As the Court may

20   recall, we set a relatively aggressive schedule for discovery

21   of 210 days.  And our belief is that in order to meet those

22   deadlines, conduct all of the depositions that need to take

23   place, we need to start getting our documents or exchanging

24   documents among the parties.

25          The issue that arose was right after the January 31

I2s9broc

1    status conference we sent a letter to the defendants saying we

2    understand that you have -- you know, you have our requests.

3    We understand that you're working on the objections.  There are

4    certain documents that we believe should be promptly produced

5    which is basically the documents concerning the communications

6    with the defendant -- among the defendants and more generally

7    documents from their active e-mails, understanding that certain

8    other things can take longer like hard copy documents and

9    network drives and other things, but collecting and producing

10   from e-mails, active e-mails should not be all that difficult

11   or time consuming.

12        The response we got back was that, well, you've asked

13   for many different types of documents, some of which we have

14   objections to.  We need to decide all the custodians that might

15   be at issue in the case in order to warrant collecting from any

16   of them, in order to warrant producing, and we need to reach

17   agreement on the full scope of discovery before we even begin

18   the rolling production.

19        The concern that we have with that is that when we

20   served our document requests back in early January and we

21   invited the defendants to meet and confer with us over any

22   issues that they had, they declined and waited until the end of

23   their 30-day period to serve their objections, which is their

24   right.  But then when we got the objections it was basically

25   every conceivable objection that you could imagine.  It was in

I2s9broc

1   total 320 pages of objections.  Now, there's some overlap

2   because they served it in three sets, depending on -- our four

3   sets, depending on the different kinds of defendants.  But

4   between 70 and a hundred pages of objections per defendant.

5          And so three business days later we served a 24-page

6   letter identifying the deficiencies.  And we have now since

7   sent them another letter on the issue of custodians.  But, it's

8   now been two weeks since we sent that letter, the 24-page

9   letter, without a response.  And so if we have to wait until

10  the very end of the meet and confer process, across all of

11  their objections, to get even the documents that they don't

12  currently object to from the custodians they've already agreed

13  to produce, we are going to be at the end of our 210-day period

14  without even having the documents to conduct the depositions

15  and so we are concerned.

16         Our personal view is that, as the documents we've

17  identified, the nonobjectionable documents from the active

18  e-mails of the custodians they've already agreed to produce,

19  those should be produced promptly.

20         The JC 16, again, they were able to produce all of the

21  documents within 30 days of getting our document requests.

22  It's now been close to 45 days since the defendants got our

23  document requests.  And at least as to that universe of

24  documents, they should be able to produce it.

25         Now the JC 16 production we served -- it wasn't quite

I2s9broc

1  identical to the documents requests that we served on the

2  Teamsters, on the Local 817, but it was pretty close.  And they

3  were able to produce.

4         And were there some issues with regard to their

5  production format?  For some of the documents, yes.  But many

6  of their documents they produced in perfectly capable -- you

7  know, perfectly legitimate, easy to use, format, including

8  native files, images.  It was -- there is no reason why the

9  defendants could not produce the same kinds of documents in the

10  same timeframe, which is really going to be necessary if we are

11  able to meet the discovery deadlines in this case.

12         And the last thing I'll note on that is the defendants

13  in their document requests said that they'll begin the rolling

14  production after 60 days but won't complete their production

15  for 150 days.  That leaves hardly any time to conduct the

16  numerous depositions that the parties will have to conduct if

17  they use even most of that time.

18         So, again, our request is that the defendants produce

19  the nonobjectionable documents as soon as they are able without

20  awaiting full resolution of all the issues that they have

21  raised in their objections, which we're perfectly willing to

22  work through on basically any schedule that they want.  But we

23  don't want to hold up the documents that are nonobjectionable.

24  And then as to the active e-mails, we request that they produce

25  those within two weeks because we think that they could do that

I2s9broc

1   just as the JC 16 has done it relatively promptly.

2                THE COURT:  Thank you.

3          Can I hear from counsel for defendants, please.

4                MR. DELL'ANGELO:  Yes, your Honor.  This is Michael

5   Dell'Angelo again speaking.

6          First and foremost, I do not think that the

7   plaintiff's concerns are well founded, nor do I think that they

8   will play out here.

9          I'd like to do some stage setting for you, your Honor,

10  so you understand where we are in the litigation and the

11  considerable efforts that we have undertaken both with respect

12  to discovery and what else is going on in the litigation.

13         As the Court I'm sure is aware, all defendants have

14  motions to dismiss due this Friday, March 2, which is a

15  considerable undertaking on our behalf.

16         A mediation has been scheduled and is on the docket

17  for March 19, which requires considerable preparation as well,

18  and we're required to submit mediation statements on March 12.

19         Meanwhile, we have been responding, evaluating and

20  responding to nearly a thousand document requests.

21               THE COURT:  I'm sorry, counsel.  I'm sorry, counsel.

22  Counsel, counsel can I pause you.

23         On the timing for the motion to dismiss and the

24  mediation date, are you seeking relief with respect to the

25  briefing schedule for the motions to dismiss in light of the

I2s9broc

1    anticipated mediation session?

2              MR. DELL'ANGELO:  It would certainly aid our efforts

3    to focus on the mediation and to focus on the discovery

4    efforts.

5              One of the problems that we've had, and we've tried to

6    communicate, is there are so many things going on at the same

7    time it requires some allocation of -- we have to decide how to

8    allocate our resources somehow.  And if the Court is amenable

9    to that, that would be extremely beneficial to our ability to

10   focus on and facilitate and get out discovery even faster.

11             THE COURT:  Thank you.  I am amenable to it.

12             Let's get to the end of this conference and then we'll

13   talk about it.  I am mindful of the energies in particular that

14   the parties will be putting into the scheduled mediation

15   session and if I could help you focus on those efforts by

16   delaying the deadline for the motions to dismiss I'd be happy

17   to hear the parties' position on it.

18             But let's focus on the discovery issues at this time.

19             MR. DELL'ANGELO:  Thank you, your Honor.  And I

20   sincerely appreciate that.

21             So what we have been doing is collecting from not only

22   the custodians we've identified in our responses and objections

23   but additional custodians that we believe -- that either the

24   plaintiff has asked for or we think are likely to have

25   documents that we've learned more about as we've gone through

I2s9broc

1    this process.  And just by way of backdrop, your Honor, simply

2    going through a thousand document requests and coordinating

3    with custodians across nine defendants involves a very

4    substantial learning curve in trying to figure out which

5    custodians have documents, where they are, who has documents

6    that are responsible for what, what exists, what doesn't.

7         So we have been extending a tremendous amount of

8    effort to identify custodians, identify sources of hard copy

9    and other ESI documents, collect those.  And just to give you

10   some perspective, your Honor, some essential files or

11   custodians, ESI is so large that it has taken three to four

12   days of computer processing time simply to extract it to begin

13   the process of getting it on the database.

14        Meanwhile we have been receiving and trying to respond

15   to a flood of discovery letters.  Mr. Kass is absolutely

16   correct.  We have not yet responded to his 24, 25-page letter

17   about the various objections in several of the document

18   requests.  We have gone through that letter very carefully.

19   We've prepared a response.  To be perfectly frank and

20   transparent with the Court, it was my hope to get that out

21   yesterday but preparing for this and working on the motions to

22   dismiss has taken some attention away from getting that letter

23   out.

24        But what I will say is I think that there is already,

25   if one looks at the document requests, considerable agreement

I2s9broc

1    about what all of the defendants are willing to do, and our

2    response to the plaintiff's letter moves that forward even more

3    substantially.  The areas that there's agreement are actually

4    fairly narrow.

5          Just the other day we received another 11-page,

6    single-spaced letter about custodians.  Meanwhile, we've had a

7    number of one to nearly two-hour telephonic meet and confers

8    where we've marched through custodian by custodian, and we've

9    tried to be very transparent, giving information about what

10   they do and how they fit in, to the extent that we know it and

11   discovered it and why they are or are not appropriate

12   custodians.

13         What I will also say is, your Honor, is the motion

14   that was filed and you have before you came twelve days after

15   responses and objections were due.

16         I think that there was an awful lot that the parties

17   could have and should have been doing to resolve these disputes

18   and move discovery ahead instead of focusing on briefing the

19   motion and all the other -- motion to compel and all the other

20   things that we've been doing.

21         But our objective is clear and we have been working

22   very hard toward balancing the speed of a production, being

23   efficient, and avoiding duplication.  Every project that

24   emerges and every ten-plus, single-spaced page letter that we

25   get and need to respond to, are then castigated for not

I2s9broc

responding to as quickly as the plaintiffs would like in light

of all the other things that we do just tends to slow down the

things that we're trying to do to get them documents.  So I

think in a number of ways the parties are talking past each

other on the process.

        But what is important to understand is what the

process has yielded.  It has yielded terabytes of data.  If the

Court takes a look at the Kellner declaration, which we

submitted as part of -- in support of our letter here and was

part of the motion to stay, there are practical realities to

what it takes to extract even active e-mails, the e-mails that

counsel wants within two weeks.  It takes a long time.  We're

not in the old days of going back to -- and I'm just old enough

to have dealt with this -- where you could go to a file cabinet

and pull out documents and have some boxes in a conference room

and get them out quickly.  Just identifying, downloading,

scheduling with custodians who are traveling all the time -- we

have one custodian whose father is terminally ill and is

perpetually out of the country dealing with his father --

trying to schedule around all these people and make collections

and tie up their phones and personal computers literally for

days to do some of this processing takes a tremendous amount of

logistical work and is also very disruptive into their

businesses.  That said, we have been pushing that process hard

and have gotten almost everything that we need and have agreed

I2s9broc

1      to produce from and I think in many instances more.

2              But what it will yield is millions of documents.  And

3      so what we recognized early on is that this process is going to

4      take some time.  We talked about that with the Court on

5      January 31 at the hearing and I think, as we put in our letter,

6      the Court was mindful of the fact that it was a tremendous

7      amount of discovery that was being asked of the defendants here

8      and it was going to take some time to process.

9              So rather than overpromise and underdeliver what we

10     suggested is, as we are permitted to do under Rule 34, we set

11     out a reasonable timeframe for the completion of discovery,

12     which is 150 days.  Given the enormous volumes of discovery and

13     what it will take to search for it and review it, I don't think

14     that that is unreasonable.  And to be clear, that is a

15     substantial completion deadline.  It is not a document dump of

16     millions of documents, 150 days from now.  The plaintiff will

17     be receiving documents on a rolling basis.  We were explicit

18     about that fact.  They asked to have union cards on February 9.

19     We prioritized and got that for them.  We were getting document

20     responses and objections out to a thousand document requests.

21     We managed to push the button on the production of those a few

22     minutes after midnight as we were rushing to get everything out

23     and were castigated for that as well.

24              That said, though, we are trying to prioritize and

25     move these things out.  But, the notion that one can go

I2s9broc

| | |
|---|---|
| 1 | through, quote, active e-mails in just a few weeks, fully |
| 2 | review them, to pull out anything that's not objectionable to a |
| 3 | thousand document requests, review them for privilege, review |
| 4 | them for responsiveness, do all the processing that's required |
| 5 | and get them out is simply not realistic.  It sets up an |
| 6 | impossible construct.  And we are trying as hard as we can and |
| 7 | devoting tremendous resources to moving this as quickly as we |
| 8 | can, mindful of the fact that the Court did not stay discovery |
| 9 | while the parties are seeking to mediate and while the |
| 10 | defendants are working on a motion to dismiss. |
| 11 | So all we ask the Court is that it recognize the |
| 12 | considerable efforts that we have undertaken and that we are |
| 13 | sincere about the hard work and attention that we've put into |
| 14 | the discovery process, and that we are doing what we can to |
| 15 | collect, review, and produce these documents in a manner as |
| 16 | quickly as we can, well within the timeframe that we've set out |
| 17 | which provides substantial time to conduct additional discovery |
| 18 | and depositions within the 210-day discovery period that the |
| 19 | Court has set out. |
| 20 | We're committed to doing that.  We're going to |
| 21 | continue to do it.  But we do need some cooperation from the |
| 22 | plaintiff in actually engaging in a substantive meet and confer |
| 23 | which we, quite frankly, have not had.  And we expect that that |
| 24 | will change now that we've had the opportunity to talk to the |
| 25 | Court.  We look forward to that so that we can get these issues |

I2s9broc

1    done and also we look to the indulgence of the Court to leave

2    us to do our work in a good faith manner and get it to the

3    plaintiffs as soon as we can.

4              THE COURT:  Good.  Thank you very much.

5              Can you give me a sense, counsel, how much time you

6    think you need to begin delivering the suite of responsive

7    documents that are, I'll call it, uncontested?

8              MR. DELL'ANGELO:  So I have given considerable thought

9    to that question, your Honor.  It is difficult to give you a

10   precise answer and it's always dangerous to make estimates.

11   But what I can tell you is it has taken, with respect to some

12   of these custodians, literally three to four days to download

13   some of the data -- as I indicated I think earlier at least one

14   of the custodians has more than a terabyte of data -- which

15   then needs to be processed according to the ESI stipulation and

16   processed so it can literally be extracted and put onto a new

17   platform.  It's not like one can just copy an Outlook box and

18   start running searches on it in a way that's efficient.  So,

19   frankly, it will take I think at least two to three weeks to

20   fully get the documents on the platform.

21             What we can do in the meantime is run searches and

22   identify responsive documents that are within the scope of

23   those that we have agreed to produce without some general or

24   specific objection or some scope or proportionality issue and

25   start producing those shortly thereafter.

I2s9broc

1          I will tell you from experience that that processing,

2     once you've identified the documents, they need to go through a

3     second privilege review and then they require some electronic

4     processing which, depending on the volume, can take a few days.

5          Now what we can do and one of the things that we tried

6     to highlight in the request is that we can make certain types

7     of documents available for inspection, and we've been having a

8     parallel conversation with the clients to see if there's

9     certain categories of, for example, hard copy documents that we

10    could make available for inspection more quickly to satisfy the

11    demands of the plaintiff to get this done as quickly as

12    possible.

13         But realistically to start making large scale

14    productions, I think realistically it's going to take at least

15    a month.  But that doesn't mean that smaller swaps of documents

16    can't be produced in the meantime if we can identify and

17    prioritize them with all the other things that we're working

18    on.

19         THE COURT:  Thank you.  Good.  Understood.  I

20    appreciate that.

21         Counsel for plaintiff, any response?

22         MR. KASS:  Yes, your Honor.

23         So I think the issue here is that if -- if this were a

24    class action antitrust case that wasn't focused on curing

25    ongoing conduct through injunctive relief on an expedited

I2s9broc

1   basis, the process that the defendants outline of making sure

2   that we have all of the parameters of the discovery taken care

3   of and we do things sort of on a relatively leisurely basis of

4   getting documents into the system takes a few days doing

5   multiple levels of review, and then ultimately producing things

6   once everything is done, that's how a lot of antitrust cases

7   are done where it's not sort of an expedited schedule.

8           But there are many antitrust cases where discovery is

9   expedited, and generally you do that in all sorts of

10  preliminary injunction proceedings, and I know this is not a

11  preliminary injunction proceeding.  But we are under a

12  relatively expedited schedule.  And so that requires that you

13  do some things to try to get the documents, at least the

14  critical documents to the other side as soon as you possibly

15  can.  And the ones that are the easiest documents to do are the

16  active -- you know, documents from the active e-mails that are

17  not objectionable.  And just as the JC 16 was able to download

18  from their custodians the relevant documents, do some search

19  terms to get the relevant documents available and produce them

20  in a relatively short order, there is no reason why the

21  defendants couldn't do it.

22          Now, what the defendants did was they waited until our

23  first meet and confer before they even started collecting their

24  documents.  So we served our document requests back in January,

25  early January.  We invited them to continue to meet and confer.

I2s9broc

1   We sent them letters about trying to get initial productions

2   with their objections and responses, so after the first 30

3   days.  And then, when the meet and confer was scheduled, after

4   they served their objections, they tell us that they hadn't

5   even started the collection process.  And then they tell us

6   that, well, not only have they not started the collection

7   process but they won't even start their rolling production

8   until they have all of the parameters of the full scope of

9   discovery worked out, including all of the custodians, all of

10  the search terms, which they have not shared with us yet, and

11  all of the other objections that they have, totaling 320 pages.

12  And our position is that that's not a reasonable way of

13  proceeding when you only have 210 days of a discovery period.

14          THE COURT:  Thank you.  Understood.

15          I appreciate that there's a significant volume of

16  discovery in this case.  I appreciate that defendants are

17  working, as I understand it, diligently in order to respond to

18  these requests.  I believe that the request presented to me

19  here is that I compel the defendants to produce readily

20  available nonobjectionable documents without awaiting

21  resolution of objections to other documents and to produce

22  within two weeks all nonobjectionable documents from the active

23  e-mails of custodians that defendants already agreed to search.

24          I understand, and please correct me if I'm wrong,

25  counsel for defendant, that you are willing to begin to produce

I2s9broc

1    nonobjectionable documents without awaiting resolution of

2    objections to all other document requests.

3            Is that right?

4            MR. DELL'ANGELO:  That is right, your Honor.  And

5    we're willing to do it in a reasonable timeframe.

6            THE COURT:  Good.  Thank you.

7            MR. DELL'ANGELO:  Our position from the outset --

8            THE COURT:  Good.  Thank you.  Understood.

9            So the second part of the request is that I direct

10   defendants to produce within two weeks that suite of documents

11   from active e-mails of custodians that defendants have already

12   agreed to search.

13           I've reviewed the affidavit of the ESI provider and

14   I've heard the comments by counsel for defendant here.  Having

15   done both of those things, I don't believe that it would be

16   reasonable for me to direct the defendants to produce within

17   two weeks that category of information.  I simply believe it

18   will take longer for them to do that work in a professional and

19   responsible way.

20           I heard counsel for defendants say that he anticipates

21   that they can begin doing that rolling production within

22   approximately a month.  I believe that that is a reasonable

23   proposal.  I'm not ordering that you do so within a month

24   because I understand that you are caveating that response.  But

25   my expectation is that you'll begin to produce documents on

I2s9broc

1    that timeframe.  And to the extent that a meaningful production

2    does not begin on that timeframe, I expect plaintiffs to raise

3    the issue with the Court.

4         Going forward I do hope that the parties will work

5    together collaboratively on resolution of these issues.  I

6    think a lot of the issues can be resolved through discussion.

7         You'll see I just put onto the docket a reference to

8    Judge Parker, this case for general pretrial just in the event

9    that there are additional disputes that need resolution, I

10   thought that she may be well equipped to be able to assist you.

11   That said, I hope that you won't really need her help and that

12   rather you'll be able to work through any of these issues on

13   your own.

14        So, counsel for defendant, can you do your best to

15   begin your production no later than a month from now.  Again,

16   I'm not ordering it but I just want to make sure we have a

17   common understanding of the timeframe in which you hope to do

18   so.

19        MR. DELL'ANGELO:  Yes, your Honor.  We already are and

20   will continue to do so and I appreciate the perspective that

21   you have added and we will act accordingly.

22        THE COURT:  Thank you.

23        So now let's talk about the motion to -- motions to

24   dismiss.  I am open to postponing the briefing schedules for

25   those.  I don't remember being aware that the mediation was

I2s9broc

1    scheduled so close on the heel of the deadlines.  It may not

2    have been set at the time of our last conference.  But I think

3    that that's a meaningful factor in figuring out how the parties

4    should be focusing their resources in the near term.

5           Counsel for defendants, would you like to request

6    additional time for submission of those motions and if so when

7    would you propose that they be due?

8           MR. DELL'ANGELO:  Thank you, your Honor.  This is

9    Michael Dell'Angelo.

10          Yes.  We would like to make that request.  And just to

11   give you, just to orient us a little bit, the Court ordered the

12   parties to court-supervised mediation had set the schedule for

13   the motions to dismiss but the mediation had not yet been

14   scheduled and it was only subsequently, so you would not have

15   known at that time that the mediation was -- what the schedule

16   for mediation was.  It has since been set by agreement of all

17   parties and the mediator on March 19.

18          As a result, I think from our perspective moving the

19   briefing schedule out 30 days would give us ample time to focus

20   on actually preparing for the mediation and all of the things

21   that go with that.  It would also allow us to focus our efforts

22   more heavily on the discovery case which I think is what the

23   Court and the plaintiff is more interested in seeing here in

24   any event.  And with the mediation scheduled on the 19th of

25   March, certainly the parties could provide an update to the

I2s9broc

1    Court about or may receive one from the court-appointed

2    mediator to give further perspective about what, if anything,

3    is necessary for the briefing at that point.

4               THE COURT:  Good.  Thank you.

5               Counsel for plaintiff, what's your view?

6               MR. KASS:  We don't have an objection if the Court and

7    the parties would like additional time on the motion to

8    dismiss.

9               THE COURT:  Thank you.

10              I'll adjourn the deadline for the motion to dismiss to

11   a month following the current date.  That should take us to

12   around April 2, if that's a weekday.  I will issue an order to

13   that effect after we end this conference.

14              I'll adjourn the deadlines for oppositions and

15   replies, maintaining the proportionate amount of time between

16   each of those dates and the originally scheduled motion date.

17              Good.  Anything else for us to discuss here, counsel

18   for plaintiff?

19              MR. KASS:  Just one thing, your Honor.  Just in the

20   interest of full disclosure, we understand that the Court has

21   assigned Judge Parker as the magistrate judge.  Just so that

22   everybody knows, she is a former partner of Proskauer.  We

23   don't have any objection to her continued role in the case but

24   I wanted everybody to be aware of that and thought it would be

25   better to just raise it so everybody knows.

I2s9broc

1           THE COURT:  Thank you.  I'll let Judge Parker make a

2    decision about whether or not she believes that she must recuse

3    herself.  I take no position on that.  I think that the way

4    that it works is that if she were to choose to do so it would

5    be randomly reassigned to another magistrate judge.  That's a

6    decision that I leave to her.  To the extent that there are

7    concerns that either party would like to raise regarding it

8    please feel free to raise them directly with her.  I'm sure

9    that she will note the fact that Proskauer is involved here and

10   take appropriate action.

11          MR. KASS:  Thank you, your Honor.

12          THE COURT:  Good.  Thank you all.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25